UNITED STATES of America, Appellee,

v.

**Nick MELIA, Appellant.**

No. 81–5293.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1982.

Decided Oct. 15, 1982.

David S. Golub, Stamford, Conn. (Leora Herrmann, Silver, Golub & Sandak, Stamford, Conn., on brief), for appellant.

John F. DePue, Dept. of Justice, Washington, D. C. (Samuel T. Currin, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Nick Melia appeals his conviction for knowingly receiving stolen property in interstate commerce in violation of 18 U.S.C. § 2315. Melia previously was tried twice on this charge in a joint trial with Alfred Conti and Larry Chinchic. The jury in the first trial initially agreed to acquit Melia, and advised the court that they had reached a verdict for one defendant. The court instructed the jury to deliberate further; one juror changed his vote on Melia's guilt and the jury finally deadlocked as to all defendants, resulting in a mistrial. After another joint trial in August of 1980, Melia and the other defendants were convicted, but Melia's conviction was reversed by this court due to impermissible joinder. *United States v. Chinchic and Melia*, 655 F.2d 547 (4th Cir. 1981). Melia was then tried separately in September, 1981. The jury initially reported that they were unable to reach a verdict, but after a modified *Allen* charge they returned a verdict of guilty. Melia appeals from the judgment entered on that verdict.

Melia principally contends that the district court committed error in the admission of three categories of evidence: (1) evidence of specific acts relating to the good character and credibility of key government witnesses, including specific acts of past cooperation with the government; and evidence of these witnesses' participation in the Witness Protection Program,[1] including evidence of death threats to the witnesses; (2) hearsay evidence showing Melia's participation in the crime; and (3) evidence that Melia had committed crimes other than the offense for which he was tried. We agree that the court committed error in each instance, and reverse and remand for a new trial.

Melia owns and operates barber and hairdressing shops in Stamford, Connecticut. He was accused and convicted of receiving approximately $647,000 worth of diamond jewelry which was stolen from Reed's Jewelry store in Wilmington, North Carolina, and allegedly sold with Melia's assistance to a Stamford physician for $70,000. There was no dispute at trial concerning the burglary of Reed's Jewelry store—the issue was whether Melia received the stolen property.

It was established at Melia's trial that in May, 1977, Robert Mercier, Melvin Maras, Leo Fraley, and Alfred Conti burglarized the Reed store and took the jewelry. The Government's case was that Maras and Fraley on the following day took the jewelry to Melia at his Stamford home, where a man subsequently identified as a Dr. Cocco examined the bulk of the jewelry, made a $30,000 down payment, and took the jewelry with him. Maras testified that he, Fraley and Melia drove to a "hospital" the next day where they received an additional $40,000 from Dr. Cocco and his promise that a $5,000 commission would be paid to Melia. Maras and Mercier pled guilty to the burglary, and testified for the Government in all three trials. Fraley disappeared and was not a witness in either trial. The Government's case was established principally by the testimony of Maras, who alone directly testified that Melia received the stolen jewelry. Mercier related the details of the burglary and corroborated certain aspects of Maras' testimony.

Over defense objection, Maras and Mercier were both permitted to testify on direct examination about specific acts of cooperation in which they provided information and assistance to the Government concerning wholly unrelated criminal incidents. Two F.B.I. agents (Nix and Fetterman) corroborated this evidence. Nix testified that Maras, acting as a paid informant, assisted in the recovery of 25 pieces of stolen heavy equipment and in the apprehension of an individual selling a machine gun. According to the testimony, Mercier, after the Reed burglary, was employed as a paid informant. The agent's testimony included references to assistance Mercier provided in solving an organized burglary ring, an armored car robbery and other crimes—all

---

1. The Federal Witness Protection Program authorized by the Organized Crime Control Act of 1970, P.L. No. 91–452, Title V, §§ 501–504, 84 Stat. 933.

unrelated to the offense for which Melia was being tried. The Government on appeal concedes that this testimony was extrinsic evidence of specific instances of conduct for the purpose of supporting the witnesses' credibility, and its admission was thus violative of Rule 608(b), Fed.R.Evid.

Maras and Mercier both testified that they were participants in the Government's Witness Protection Program. Mercier testified about a death threat he had received as a result of his cooperation with the Government. He described the security measures taken to protect him and his family. Agents Nix and Fetterman, on direct examination, corroborated Mercier's death threat testimony and described in detail Mercier's and Maras' participation in the Witness Protection Program. Nix also testified that the F.B.I. was concerned about Maras' safety and had discussed it with him. In testifying favorably about Maras' character and his reliability as an informant, Nix made other references to Maras' entry into the Witness Protection Program. In addition, the Government, over defense objection, was allowed to produce the testimony of an inspector in the U. S. Marshal's Service describing the Witness Protection Program and stating that the purpose of the Program was to remove witnesses from danger.

Mercier testified that he was not with Maras and Fraley when they allegedly took the jewelry stolen from Reed's to Melia. He related, however, that he and Fraley had visited Melia in Stamford on several previous occasions, and that on one of these occasions they attempted to sell Melia stolen jewelry. Mercier also detailed his discussion on that prior occasion of other possible burglaries with Melia. He could not provide any details about the dates of the visits, the places in Stamford visited, the names of persons contacted, or the jewelry stolen, except that the sale of jewelry involving Melia was to an "older gentleman, tall ... gray hair, very dignified looking." Defendant objected to all of this testimony by Mercier as violative of Rule 404(b) of the Federal Rules of Evidence, which governs the admissibility of "other crimes" evidence.

Melia also objected to Government evidence which he argues was inadmissible hearsay. F.B.I. agent Nix was asked "What did Mercier tell you at the time ... regarding the disposition of the jewelry from Reed's Jewelry store?" Nix answered "that he had been asked to go along on the trip initially to sell that jewelry but did not, but was subsequently told by Maras and Fraley that the jewelry had been sold to Nick Melia." This evidence was admitted over objection, without any instruction to the jury. Mercier also testified that he heard Fraley tell Maras that Fraley "felt that the best thing would be to take it up to Connecticut ... to see what price they could get from Mr. Melia or Mr. Melia's contact up there." He also testified that Fraley told him that the older man to whom Mercier had previously sold stolen jewelry at Melia's house was a doctor.

There is a physician in Stamford by the name of Dr. Thomas Cocco. He appeared at trial and denied knowing Maras. Cocco testified that he had been a frequent customer at Melia's barber shop and that Melia had been his patient. He denied purchasing any jewelry from Melia. The Government did not produce evidence of the existence of a hospital, nor of a room in a hospital, matching the description of the hospital identified by Maras as a place where he and Melia met and dealt with Dr. Cocco.

## I.

The Government may appropriately introduce evidence of their witnesses' participation in the Witness Protection Program in order to counter any inference of improper motivation or bias and, under some circumstances, may present this evidence on direct examination in anticipation of a defense attack upon the witnesses' credibility. However, such evidence, particularly when it includes evidence of death threats to a witness and his family, could easily lead a jury to believe that the defendant is the source of threats. Such evidence should therefore be presented with great caution. *United States v. Martino,* 648 F.2d 367, 389 (5th Cir. 1981), *cert. de-*

*nied,* —— U.S. ——, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *United States v. Ciampaglia,* 628 F.2d 632 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. DiFrancesco,* 604 F.2d 769, 775 (2d Cir. 1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Check,* 582 F.2d 668, 685 (2d Cir. 1978); *United States v. Partin,* 552 F.2d 621, 644–45 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). *See United States v. McManaman,* 606 F.2d 919, 926 (10th Cir. 1979); *United States v. Rios,* 611 F.2d 1335, 1342–43 (10th Cir. 1979); *United States v. Weir,* 575 F.2d 668, 671 (8th Cir. 1978). The Government in this case presented direct evidence from five separate witnesses of death threats to Mercier, of the Government's concern for the safety of Maras and Mercier, and of their participation in the Witness Protection Program. The prosecutor on two occasions reproduced this evidence by redirect examination and referred to the Witness Protection Program during his opening and closing statements.

■ There can be no simple formula with which to calculate how much evidence concerning the Witness Protection Program is appropriate and permissible in a given case to counter defense attempts to discredit Government witnesses. Circumstances vary with each trial. The trial court must exercise its discretion, bearing in mind the purpose of the evidence—to rebut, in appropriate circumstances, the appearance of special treatment and improper motivation or bias. It is always possible, however, that the jury might improperly infer that the defendant is the source of threats, so the possible inflammatory consequences of such evidence should be a primary concern. As a reviewing court, we must consider whether such evidence was in its totality excessive and likely to excite the jury, encouraging them to make improper inferences linking the defendant to threats against the witness. Thus viewed, the dramatic testimony of Maras, Mercier, F.B.I. agents Nix and Fetterman, and the inspector from the U. S. Marshal's Service, was excessive—an abuse by the government of its privilege to utilize

this potentially volatile evidence. It is quite possible that the jury considered this impressive testimony as positive evidence of Melia's bad character and guilt. The sum of this and the concededly erroneous bolstering of the credibility of Maras and Mercier, in a trial revolving essentially on credibility is prejudice to the defendant requiring a new trial.

## II.

The trial court admitted, under Rule 404(b) of the Federal Rules of Evidence, Mercier's testimony that he had been to Melia's house in connection with previous illegal ventures. Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ Evidence of other bad acts, to be admissible, must be probative of some facts other than the bad character of the defendant. *United States v. Masters,* 622 F.2d 83 (4th Cir. 1980). The Government contends that the evidence of Mercier's former illicit contacts with Melia was offered to prove Melia's knowledge that the Reed's jewelry was stolen. Such knowledge is relevant, says the Government, because Melia was tried for a "specific intent" crime. Relevance, however, is only one factor to be considered in judging the admissibility of evidence of "other bad acts." The evidence must also be necessary and reliable, and a court must weigh the probative value against the possible prejudicial impact of the evidence. *United States v. Davis,* 657 F.2d 637, 639 (4th Cir. 1981); *United States v. DiZenzo,* 500 F.2d 263, 265–66 (4th Cir. 1974); *United States v. Woods,* 484 F.2d 127, 134 (4th Cir. 1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974). In this case, assuming Mercier's testimony of prior jewelry sales involving

Melia was relevant on the issue of intent, it is questionable whether Mercier's testimony about Melia's previous planning of other burglaries was equally relevant. Assuming again that Mercier's testimony was not only relevant but necessary to establish intent, it is also doubtful whether it was necessary to show such a wide range of "other bad acts." The vagueness of Mercier's descriptions of the incidents makes the reliability of his testimony questionable as well. These considerations diminish the probative value of the "other bad acts" evidence. Weighing the probative value against the prejudice resulting from the portrayal of Melia as a burglary ring mastermind, we are compelled to conclude that the trial court abused its discretion in permitting Mercier to testify as he did concerning the previous "other" acts.

### III.

█ Agent Nix testified that Mercier told Nix the substance of what Maras and Fraley had related to Mercier concerning the sale of the jewelry to Melia. This was impermissible double hearsay, proscribed by Rule 802 of the Federal Rules of Evidence and unredeemed by any of the exceptions. Mercier's testimony concerning Fraley's statement to Maras that the best thing would be to take the jewelry to Connecticut was also objectionable hearsay.

The Government's case depended principally on the direct testimony of Maras, and on the credibility of Maras and Mercier. The excessive testimony about the Witness Protection Program and the improper credibility evidence in the Government's case-in-chief were highly prejudicial. The additional admission of critical hearsay testimony, and the less egregious but nevertheless erroneous admission of "other crimes" evidence resulted in a trial in which it is unlikely that the jury was convinced beyond a reasonable doubt of Melia's guilt solely by properly admitted evidence.

The judgment of the district court is therefore reversed and the case remanded for a new trial.

REVERSED AND REMANDED.

MURNAGHAN, Circuit Judge, concurring:

The evidence of Melia's connection with previous illegal ventures was extremely relevant on the issue of whether Melia was (a) just another innocent duped by the prospect of a dazzling bargain and motivated only by understandable human greed, or (b) an experienced and intending fence, preying inhumanly on his fellow man. It is difficult to imagine how better to go about proving a necessary ingredient of the crime charged.

While it is true that, in this, as in almost all things, excess is to be avoided, I do not believe that we should, in advance, tie the district court's hands as to what, and how much, evidence of other crimes, wrongs or acts might properly be admissible under F.R.Evid. 404(b) in the course of the new trial which we have ordered.

Therefore, I disassociate myself from section II of the majority opinion and from the conclusion that admission of the other crimes evidence was "less egregious but nevertheless erroneous." A decision on that point is not required in view of the other reasons mandating a remand for a new trial so tellingly presented in Judge Sprouse's opinion. If a decision is to be made, it should be deferred until the question is presented under the actual circumstances of a new trial, and not dealt with in terms of a trial flawed for other reasons and not presenting the conditions in which the question will actually arise.

Since the balance of the opinion has my ready concurrence, and leads inexorably to the result of reversal and remand for a new trial, I concur.