STATE of Minnesota, Respondent,

v.

Mark Orlando HARRIS, Appellant.

No. C3–93–1790.

Supreme Court of Minnesota.

Aug. 26, 1994.

John M. Stuart, State Public Defender, Bradford S. Delapena, Sp. Asst. State Public Defender, St. Paul, for appellant.

Mark Orlando Harris, pro se.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Appellant, Mark Orlando Harris, was charged in Hennepin County District Court with murder in the first degree in violation of Minn.Stat. § 609.185(2) (1992) for the death of Carol Abelseth.[1]  Following a jury trial, Harris was found guilty of Abelseth's murder and sentenced to life in prison.  In seeking a new trial, Harris asserts: (1) it was error for the trial court to permit the prosecutor to introduce and exploit evidence that several of the state's witnesses had been placed in a witness protection program because of their fear of Harris;  (2) the trial court abused its discretion by admitting highly prejudicial and inflammatory evidence of threats made by Harris to witnesses and evidence Harris masturbated in his jail cell to a newspaper photograph of the victim;  (3) it was serious

---

**1.** 609.185  MURDER IN THE FIRST DEGREE.
      Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
            *      *      *      *      *      *
      (2) causes the death of a human being while committing or attempting to commit criminal

sexual conduct in the first or second degree with force or violence * * *.

misconduct for the prosecutor to attempt to elicit inadmissible character evidence; and (4) the trial court violated Harris' fifth, sixth, and fourteenth amendment rights by giving the deadlocked jury instruction prior to jury deliberations.[2]

We find the prosecutor's exploitation of evidence related to the placement of witnesses in the protection program, including threats against witnesses, the prosecutor's attempts to elicit inadmissible character evidence, and the admission of highly prejudicial testimony that Harris masturbated in his jail cell while looking at a newspaper photograph of the victim to be error. The cumulative effect of the errors denied Harris a fair trial. We therefore vacate the conviction and remand for a new trial.

According to the prosecution's theory of the case, Abelseth spent the night of July 14–15, 1992, barhopping, using Knicker's Bar on Lyndale Avenue South in Minneapolis as a home base. Abelseth left Knicker's several times during the evening with an off-duty Knicker's manager to visit other bars and to attend a concert. She returned to Knicker's the final time right before last call. Abelseth was last seen alive, by someone other than her killer, talking to two men in front of Knicker's shortly after closing. Harris was one of these men. The other man seen speaking with Abelseth that night testified he last saw Abelseth when she got into Harris' car.

Abelseth's body was discovered at approximately 6:00 a.m. on July 15 in Minneapolis' Bassett Creek Park. Based on the absence of blood under the body, police concluded she had been killed elsewhere and her body dumped in the park. The autopsy determined Abelseth died between 1:30 and 6:00 a.m. on the 15th, had a blood alcohol level of .22 at the time of her death, and had been sexually assaulted. Abelseth's death was caused by two violent blows to the left side of her head with a blunt object.

In a search of the car Harris was driving the night of the murder, police found hair that was consistent with Abelseth's. Forensic tests disclosed that fibers from the rear carpet of Harris' car were on Abelseth's body. Seven small spots of human blood were found on the inside of the rear windshield of the car, but contained insufficient material for further testing. DNA tests done on semen stains on the t-shirt Abelseth was wearing matched samples taken from Harris and eliminated the other suspects. Harris and the prosecutor stipulated the semen on Abelseth's t-shirt came from Harris.

At trial, the state called three witnesses who had been incarcerated in the county jail with Harris. Each testified he met Harris for the first time in jail, and that Harris admitted to killing Abelseth. These three witnesses, along with two others, were placed in the county's witness protection program and received favorable treatment in criminal cases pending against them in exchange for testifying at Harris' trial. All were placed in the witness protection program because they feared for their personal safety. The state also presented two *Spreigl* witnesses who testified Harris had used force to compel them to have sex with him.

Harris testified in his own behalf at the trial. He testified he left home on the night of July 14 at about 9:30 p.m., driving his girlfriend's car to take a friend home. While en route he met several other friends and agreed to meet them later at William's Pub for a drink. After dropping his friend off at about 10:00 p.m., he drove by William's Pub but did not see any cars he recognized. He continued on to Knicker's to see if his friends

---

**2.** We find no merit to the jury instruction issue. Harris, by pro se brief, argues the trial court erred by giving the "deadlocked jury" instruction, 10 Minn.Dist. Judges' Ass'n, *Minnesota Practice*, CRIMJIG 3.04 (3d ed. 1990), prior to jury deliberations thereby denying him his rights under the Minnesota Constitution, art. I, §§ 6, 7, and the fifth, sixth, and fourteenth amendments of the U.S. Constitution.

As a part of its final charge to the jury, the court read the instruction in CRIMJIG 3.04.

This instruction is very similar to the instruction in A.B.A., Standards for Criminal Justice 15–4.4 (1986), which was approved, in its earlier form, by this court in *State v. Packer*, 295 N.W.2d 266, 267 (Minn.1980). This court stated in *Packer* the 15–4.4 instruction should be given in the original charge, "thereby forewarning the jury how it should proceed to forestall a deadlock." The trial court was not in error when it did exactly that.

had gone there. As he arrived at Knicker's, Abelseth was coming out of the bar and he stopped to talk to her. He testified that shortly after 10:00 p.m. he and Abelseth drove to a nearby parking lot to have sex in his car. According to Harris, they had done this several times in the past. After having sex with Abelseth, Harris says he dropped her off at Knicker's at approximately 11:00 p.m. and then drove back to William's Pub where he found his friends and joined them. They later went to Classic's and Figlio's. When Figlio's closed, Harris says he left his friends and drove past Knicker's on his way home.

Harris claims that upon seeing Abelseth and an acquaintance, Eric Paine, in front of Knicker's, he stopped to talk with them. He testified he last saw Abelseth standing in front of Knicker's lighting a cigarette at about 1:35 or 1:40 a.m. on the 15th as he left for home. Both Harris and his girlfriend testified he arrived home at about 2:00 a.m. on the 15th.

Harris testified that while in jail he had copies of the police reports on his case which he read every night and which he discussed with other inmates in his cell block, including Percy Melton and Alan Heinninen. He denied, however, making any confession to Melton, Heinninen, or anyone else while in jail.

In her opening statement the prosecutor emphasized that several witnesses participated in the county's witness protection program and were fearful of testifying.[3] Then, on direct-examination, she asked witnesses

Paine, Berry, and Heinninen about their personal safety concerns. Each indicated he had received some threat connected to testifying in this case. She also asked each witness to explain the threat received. Berry testified that the night before his grand jury appearance his car was stolen and when recovered had a gang symbol on it. Paine testified his "car got burned up" and another car was stolen. Heinninen testified he started to get threatening phone calls at home warning him not to testify and that he would be dead if he did. Furthermore, when the prosecutor asked him about his fears, Heinninen responded, "I'm aware of the connection with the gangs." However, the prosecution offered no evidence linking Harris to any of these threats.

■ In seeking a new trial, Harris contends the prosecutor elicited and improperly exploited evidence that several prosecution witnesses had been placed in the county's witness protection program because they feared Harris. He also claims the trial court failed to take proper precautions with regard to this evidence. While we have not specifically addressed the admissibility of witness protection evidence in the past, such evidence, like all other evidence, must be relevant to be admitted. Minn.R.Evid. 402. Generally, evidence is relevant if "in some degree it advances the inquiry and thus has probative value." *State v. Carlson*, 268 N.W.2d 553, 559 (Minn.1978) (per curiam). However, as we have often said, even relevant evidence may be inadmissible where its

---

**3.** That opening statement included the following: [You] will hear how Eric Paine is extremely frightened for his life to come in here and testify, and you will learn that, to assure his testimony in this case, the State agreed * * * to relocate him, his wife, and his small child.

\* \* \* \* \* \*

Walter Berry will tell you he is frightened for his life to come in here and testify in this case [because he] * * * had a pending drug case and he felt if he was convicted of that offense, he would be sent to prison and that that would be a death sentence for him, if he came to testify against this Vice Lord. * * * [Y]ou will also learn that Walter Berry and his children have been relocated out of this State.

\* \* \* \* \* \*

You will learn that at the time that [Alan Heinninen] provided this information to the police,

all he asked for was protection from the defendant because he had learned from the defendant that he was a Vice Lord and that he had heard threats the defendant was making about witnesses.

\* \* \* \* \* \*

And you will also learn that Alan Heinninen has received death threats about testifying in this case and that he, too, has had to be relocated by the State.

\* \* \* \* \* \*

You will learn that Percy Melton has also been relocated and protected by the State in this matter.

probative value is substantially outweighed by its potential to cause unfair prejudice, to confuse the issues, or to mislead the jury. Minn.R.Evid. 403.

■ Evidence of a witness' participation in a government-sponsored protection program is generally relevant because the defendant is entitled to impeach the witness' credibility by establishing the witness benefitted from the program. *United States v. DiFrancesco,* 604 F.2d 769, 775 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). In anticipation of the challenge to the witness' credibility, the prosecution may wish to bring out the witness' involvement in the program so as not to appear to be hiding anything from the jury. *Id. See also United States v. Martino,* 648 F.2d 367, 388 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 2007, 72 L.Ed.2d 465 (1982). To bolster the witness' credibility, the prosecution may also want to introduce evidence that the decision to testify has resulted in negative consequences to the witness. This evidence, while probative and therefore relevant, may also be highly prejudicial in that the jury may infer the defendant is connected to the negative consequences which caused the witness to be placed in the protection program. *United States v. Webster,* 769 F.2d 487, 491 (8th Cir.1985). If admitted, the trial court must give the jury explicit instructions as to the use of the evidence. *See, e.g., United States v. Partin,* 552 F.2d 621, 644 (5th Cir.) *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The trial court must also strictly control the use of the evidence by the prosecution to prevent its exploitation. *Id.* at 645.

■ Because circumstances vary with each trial, there is no simple formula with which to calculate how much evidence con-

cerning a witness protection program is appropriate and permissible in a given case. *United States v. Melia,* 691 F.2d 672, 676 (4th Cir.1982). The trial court must bear in mind the purpose of the evidence: "to rebut, in appropriate circumstances, the appearance of special treatment and improper motivation or bias." *Id.*[4] Witness protection evidence is admitted to promote or to rebut an inference about the credibility of the testifying witness, and has no relationship to the defendant. The prosecutor may neither encourage nor exploit the inference that fear of a particular defendant caused the witness to seek the state's protection. *Id.; United States v. DiFrancesco,* 604 F.2d 769, 775 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

■ In this case the prosecutor did precisely what the *Melia* court warned against. The prosecutor's questioning of witnesses about their participation in the protection program did not just occur once or with only one witness, but rather was an important focus of her direct-examination of these witnesses. This repeated questioning created an inference that Harris was responsible for the threats to Paine, Berry, and Heinninen, an inference unsupported by any evidence.

The cumulative effect of these continuous references to witnesses' fear was to create the inference that Harris was of bad character and had a propensity to commit crimes of violence. Further, the questions asked here were not isolated, but repeated, and likely to have a substantial impact on the jury. *See State v. Wilford,* 408 N.W.2d 577, 580 (Minn. 1987). The trial court, in addition to allowing witnesses to imply that Harris was the source of their fear and of the threats against them, gave no curative instruction to minimize the potential for prejudice. *Id.*[5] We

---

4. In *Melia,* the government presented direct evidence from five separate witnesses of death threats against one witness, of the government's concern for the safety of two witnesses, and of those two witnesses' participation in the protection program. In addition the prosecutor, on two occasions, produced this evidence by redirect-examination and referred to the witness protection program in opening and closing arguments. The court found this to be an abuse by the government of its privilege to utilize this

potentially volatile evidence. Because the court, *inter alia,* considered it "quite possible that the jury considered this testimony as positive evidence of [the defendants] bad character and guilt," it reversed the trial court and granted the defendant a new trial.

5. Although the defense admits no limiting instruction was requested, and therefore Harris is not seeking to establish error on this issue, we believe that without such an instruction the po-

find the trial court erred by allowing the inference, where there was no evidence, that Harris was the source of the danger or perceived danger which caused the witnesses to seek the state's protection and by allowing the prosecutor to exploit this inference.

■ Harris also complains the trial court erred by admitting evidence of direct threats allegedly made by him against Bell, Paine, and Melton.[6] The state argues, and we agree, evidence of threats to witnesses may be relevant in showing consciousness of guilt. *United States v. Gonzalez*, 703 F.2d 1222, 1223 (11th Cir.1983) (per curiam). We have held, however, evidence of a prior threat is not admissible if it is characterized as tending to show defendant's propensity or disposition to commit the crime charged. *State v. Thieman*, 439 N.W.2d 1, 6 (Minn. 1989); Minn.R.Evid. 404(a).

■ Where evidence of threats are admissible, the trial court must still provide safeguards including cautionary instructions to prevent the evidence from being misused. *See, e.g., State v. Wilford*, 408 N.W.2d 577, 580 (Minn.1987). Because there was direct evidence Harris threatened Bell, Paine, and Melton, we find the evidence properly admitted as showing Harris' consciousness of guilt. The trial court erred, however, by failing to give the jury cautionary instructions.

■ Harris next argues the trial court abused its discretion by admitting highly inflammatory evidence that Harris masturbated while looking at a newspaper photograph of the victim. During direct-examination the prosecutor elicited testimony from Percy Melton that he recognized a newspaper article containing a photograph of Abelseth as one Harris had in his cell. After being asked numerous times over defense objections about what he had seen Harris do with the article, Melton responded he observed Harris

standing naked on his toilet masturbating to the photograph in the article. Harris alleges this testimony was highly inflammatory, and its probative value was substantially outweighed by its prejudicial impact. The prosecutor contends the evidence was necessary to show Harris knew the victim.

This evidence had no probative value. If its purpose was, as the prosecutor asserts, to establish Harris knew who the victim was, it would have been enough to inform the jury Harris had the article in his cell. Telling the jury Harris masturbated while looking at the photograph gave the jury no information as to whether Harris had known Abelseth. Indeed, the fact that Harris had the newspaper article in his cell gave the jury no information as to whether Harris had known Abelseth.[7] The only purpose this evidence served was to further the prosecutor's goal of creating for the jurors an immensely disturbing image of a naked Harris, in plain sight of other inmates and passing guards, sexually revelling over a picture of his purported victim. Harris was not on trial for masturbation. Yet, after hearing this evidence, the jury was left with an indelible portrait of him as a sexual deviant. In eliciting this testimony the prosecutor created a danger that the jury would convict Harris not for what he allegedly did to Abelseth, but for what he allegedly did with her photograph. Two evidentiary rules independently require the exclusion of this evidence. First, it had no probative value and thus was not relevant. Minn.R.Evid. 402. Second, the evidence, even if it had probative value, was so extremely prejudicial that it should have been excluded. Minn.R.Evid. 403.

■ Harris contends the prosecutor committed serious misconduct by intentionally eliciting inadmissible character evidence. First, Harris complains the prosecutor ex-

---

tential for prejudice was great. We note, given the extent to which the evidence of fear and threats was exploited, it is questionable in this case whether a curative instruction would have prevented the prejudicial impact of this testimony.

6. Bell testified that on two occasions Harris, while in jail, threatened him with physical harm for testifying in this case. Bell's testimony in this

regard was corroborated by a Hennepin County Deputy Sheriff who was escorting Bell to and from the jail at the time the threats were made. Bell also testified Harris told him he was going to have Percy Melton "beat up, took out." Percy Melton testified Harris had asked him to kill Eric Paine.

7. It is not at all unusual for a criminal defendant to possess news articles covering his case.

posed the jury to evidence of two prior bad acts by questioning two witnesses to elicit testimony that Harris had planned to beat his "wife" [8] with a baseball bat and had made intimidating statements to a female friend. In both instances Harris objected and the trial court sustained the objections, struck the answers, and instructed the jury to disregard the testimony.

Minn.R.Evid. 404(b) provides for the admission of evidence of other bad acts as follows:

> Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence.

The admission of prior bad acts evidence under Minn.R.Evid. 404(b) "requires the evidence be relevant to a material issue other than character, subject to proof by a preponderance of the evidence, more probative than prejudicial, and similar in kind and close in time to the crime charged." *United States v. Kandiel*, 865 F.2d 967, 972–73 (8th Cir.1989).

The trial court acted properly here. We find little, if any, probative value to this evidence, but a great potential for unfair prejudice. In fact, the potential for unfair prejudice is so great, and so patently obvious, the prosecutor should have known better than to attempt to get the evidence to the jury.

Harris also complains the prosecutor sought to elicit testimony of other prior bad acts which the trial court had specifically instructed her not to do. Witnesses were asked questions relating to Harris assaulting the woman he was living with, complaints about Harris from several women at the halfway house, and Harris' being directed by the halfway house to contact the Domestic Abuse Project. One of the witnesses was also asked whether she feared Harris. The trial court sustained Harris' objection to all of these questions, the questions were stricken, and the jury was instructed to disregard what they had heard.

■ The prosecutor's persistence in violating the trial court's rulings had the effect of diverting the jury's attention from its primary task of determining whether Harris murdered Abelseth. Questions by a prosecutor calculated to elicit or insinuate inadmissible and highly prejudicial character evidence and which are asked in the face of a clear trial court prohibition are not tolerable.[9]

■ We have made it clear that "[t]he state will not be permitted to 'deprive a defendant of a fair trial by means of insinuations and innuendos which plant in the minds of the jury a prejudicial belief in the existence of evidence which is otherwise inadmissible.'" *State v. Tahash*, 280 Minn. 155, 157, 158 N.W.2d 504, 506 (1968) (quoting *State v. Currie*, 267 Minn. 294, 301, 126 N.W.2d 389, 395 (1964)). Use of such insinuation and innuendo is reversible error "whether the allusion to prior misconduct is contained in the question which the prosecutor asks or in the answer which the witness gives." *Id.* Here, the prosecutor's single-minded determination to bring in a guilty verdict succeeded, but at the cost of undermining the value of the trial as a truth-determining process.

The prosecutor had a strong case. Two eyewitnesses testified to seeing Abelseth get into Harris' car hours before she was murdered. There was DNA evidence as well as a stipulation by the defense that it was Harris' semen on the victim's t-shirt. Several witnesses testified Harris had confessed to them he had committed the murder. Fibers from the rear floor carpet of the car Harris

---

8. References by witnesses to Harris' "wife" appear to be references to the girlfriend with whom Harris lived.

9. We will only excuse the asking of improper questions where they are brief, not repeated, and unlikely to have had a substantial effect on the jury. *State v. Wilford*, 408 N.W.2d 577, 580 (Minn.1987). Even a prosecutor's good-faith disagreement with a trial court affords no basis for violating a judicial ruling. Any time a prosecutor desires to make an inquiry of doubtful propriety, the prosecutor should seek permission from the trial court in chambers before asking the question. *State v. McRae*, 494 N.W.2d 252, 259 (Minn.1992).

was driving the night of the murder were found on the victim's body, and hair consistent with the victim's was found in the car. The admissible evidence was sufficient for the jury to find Harris guilty.

 The role of the prosecutor and trial court is not simply to convict the guilty, they are also responsible for providing a procedurally fair trial. Strong evidence of guilt does not—cannot—deprive a defendant of the right to a fair trial. "The prosecutor has an overriding obligation, shared by the court, to see that [sic] defendant receives a fair trial, however guilty he may be." *State v. Sha,* 292 Minn. 182, 185, 193 N.W.2d 829, 831 (1972). They did not meet that obligation here. As a result, it is not clear to us whether the jury found Harris guilty because of the relevant evidence and reasonable inferences therefrom, or because of inadmissible evidence and innuendo. If Harris is to be convicted, it must be based on admissible evidence presented at a fair trial.

Considered in its entirety, the record reveals a trial which clearly decided that Harris is a bad man. The question the trial was to answer, however, was whether Harris murdered Carol Abelseth. Because of the exploitation of the witness protection evidence, the admission of masturbation evidence and the prosecutor's effort to elicit inadmissible character evidence, we are not confident the jury had a reasonable opportunity to focus on that question. We are reluctant to grant a new trial, especially where on retrial the result is likely to be the same. But where a fair trial has been denied "to allow factually strong cases to erode such a basic right is to deny the existence of the right." *State v. Reardon,* 245 Minn. 509, 514, 73 N.W.2d 192, 195 (1955). Because we conclude Harris was denied a fair trial, we vacate his conviction and remand the case for a new trial.

Conviction vacated and case remanded for a new trial.

ANDERSON, J., took no part in the consideration or decision of this case.