**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 07-4023**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

GODFREY BONSU,

        Defendant - Appellant.

---

**No. 07-4024**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

VICTORIA BOATENG,

        Defendant - Appellant.

---

Appeals from the United States District Court for the District of
Maryland, at Baltimore.  Catherine C. Blake, District Judge.
(1:05-cr-00422-CCB)

---

Argued: March 18, 2008        Decided: August 20, 2008

---

Before NIEMEYER and SHEDD, Circuit Judges, and Irene M. KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Gerald Chester Ruter, Towson, Maryland; Sicilia Chinn Englert, LAWLOR & ENGLERT, L.L.C., Greenbelt, Maryland, for Appellants. Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following their convictions for conspiracy to import and possess with intent to distribute one or more kilograms of heroin, Appellants Godfrey Bonsu ("Bonsu") and Victoria Boateng ("Boateng") (collectively the "Appellants") appeal their convictions and sentences. They argue that the district court erred when it admitted certain testimony and applied various provisions of the Sentencing Guidelines to enhance their sentences. Finding no error, we affirm the district court.

I.

This case involves a conspiracy to import heroin from Ghana for distribution in the United States. After the government broke up the drug ring, three members of the conspiracy, Hopkins Appau ("Appau"), James Manu ("Manu") and Linda Richardson ("Richardson"), all of whom had acted as heroin mules, testified at trial as witnesses for the government. Appau's story illustrates their typical experience.

In 2004, Appau, a citizen of Ghana, was approached there by someone named "Ricky" who offered to pay him a significant sum of money to smuggle heroin into the United States. After Appau agreed, Ricky provided him with a plane ticket, a $500 cash advance and instructions on how to contact another co-conspirator in the United States. He also gave Appau a business card for a hotel and

3

directed him to stay there during his visit. Ricky warned Appau to keep quiet if questioned by law enforcement. Shortly before leaving Ghana, Appau swallowed approximately 55 pellets containing heroin.

After arriving at Baltimore-Washington International Airport ("BWI") on June 21, 2004, Appau checked into the hotel as instructed. Shortly after that he received a telephone call from Boateng, whom he knew as "Adwoa," "Sister Vic" and "Sister Vickie." While at the hotel, Boateng was Appau's primary contact. She brought him milk to drink so he could pass the heroin pellets, and then retrieved the pellets from him. She also invited Appau to dine with her family on two occasions. During those dinners, Appau met Bonsu, whom Boateng introduced as "Kofi Agyemang." Eventually, Boateng paid Appau $3,000 in cash for his services. She also asked him to carry money back to Ghana with him but Appau refused out of fear that the Ghanaian authorities would seize the money.

Several months after his return to Ghana, Boateng contacted Appau and asked him to again smuggle heroin into the United States. In December 2004, he swallowed 60 pellets of heroin and again flew into BWI where, on December 16, 2004, Customs and Border Patrol ("CBP") and Immigration and Customs Enforcement ("ICE") agents arrested him as he attempted to enter the country. Initially, Appau claimed to be a fashion designer from Ghana and denied any involvement in drug trafficking. Eventually, however, he admitted

4

to being a heroin mule. While in custody, he passed the heroin pellets, which the arresting agents recovered as evidence.

One of those agents, CBP Officer Luis Nieto ("Officer Nieto"), also seized a number of documents from Appau, including (1) a business card and paperwork bearing the address of the hotel where Appau had stayed in June, (2) Appau's passport, which documented his previous trip to the United States, (3) a scrap of paper with the name "Agyeman Kofi" and the telephone number 240-381-1870 and (4) airline and Greyhound bus tickets. After Nieto confirmed that the telephone number belonged to Boateng, Appau agreed to cooperate with law enforcement and, beginning on the night of his arrest, placed a series of monitored telephone calls to Boating's number. Although Boateng initially answered the telephone, she passed the call to Bonsu. Thereafter, all other monitored telephone calls were between Appau and Bonsu. These conversations were conducted in Twi, Appau's native tongue.

During the calls, Appau led Bonsu and Boateng to believe he had been detained by authorities pending an immigration investigation and that he was staying at a hotel. Bonsu suggested that he attempt to escape and warned Appau against speaking with the authorities. Bonsu also asked Appau whether he was still in possession of the "things," which Appau understood to mean the heroin pellets.

Eventually, Bonsu asked Appau for the telephone number of his hotel room, after which he called Appau repeatedly to monitor and direct his activities. Bonsu again advised Appau to escape and inquired whether the police were still nearby. He repeatedly inquired about the "things" and "stuff" Appau had been carrying, what Appau had told the authorities and whether he had given them an address. Bonsu also threatened Appau to remain silent. In one of their conversations, for example, Bonsu inquired as follows:

> Bonsu: Right now, do you have your ticket and passport with you or with them?
> Appau: They are all with them.
> Bonsu: They are all with them?
> Appau: Yes.
> Bonsu: Are they with you?
> Appau: No.
> Bonsu: Have they collected them?
> Appau: Yes.
> Bonsu: Okay. So, up till now, no one has come to you.
> Appau: No, but I don't know whether they are around or not. As it is, I really don't think they will let me go free.
> Bonsu: You are sure they will not let you go?
> Appau: Yes.
> Bonsu: Is someone by your side right now?
> Appau: No.
> Bonsu: Then why can't you find a place in the hotel and leave?
> Appau: Hmm, they brought me here so . . . .
> Bonsu: Yes, I know. But if they have collected the things then why don't you try and leave? Or have they locked the door and taken the key with them?
> Appau: Yes and not all the "stuff" is out.
> Bonsu: Are the "things" with you?
> Appau: No, not all of them are out.
> . . .
> Bonsu: Did they ask you if you could identify the house address?
> Appau: They didn't ask me because I don't know the place.
> Bonsu: Uh.
> Appau: That is not a problem.

. . .
     Bonsu: If they ask you about who sent you, don't mention
     any names because whatever happens will be on the
     Internet and then we will know what to do.
     Appau: Okay.
     Bonsu: If they ask you and you mention any names, it will
     create more problems.
     Appau: Okay.


## II.

The government indicted Appellants on September 15, 2005, charging them with conspiracy to import one or more kilograms of heroin in violation of 21 U.S.C. § 952(a) and conspiracy to distribute and possess with intent to distribute one or more kilograms of heroin in violation of 21 U.S.C. § 841. Following a jury trial, Appellants were convicted on both counts on February 6, 2006.

The district court sentenced Bonsu and Boateng on December 1, 2006. With a base offense level 32, criminal history category I, and a two-level adjustment as a supervisor of one or more other participants in the conspiracy, Boateng's advisory guideline range was 151 to 188 months of incarceration. After considering the factors at 18 U.S.C. § 3553(a), the district court imposed a variance sentence of 135 months of incarceration.

Like Boateng, Bonsu had a base offense level 32 and criminal history category I. However, he received a two-level adjustment for obstruction of justice for committing perjury during a suppression hearing and a three-level adjustment for being a

7

manager or supervisor of five or more participants in criminal activity. His advisory guideline range, therefore, was 210 to 262 months of incarceration. After considering all of the statutory factors at 18 U.S.C. § 3553(a), the district court imposed a variance sentence of 168 months of incarceration.[1] Following their sentencings, both Appellants timely noted their appeals to this Court.

III.

The starting point of our analysis is our standard of review. We review de novo the denial of a motion to dismiss an indictment by determining if the evidence, in the light most favorable to the government, could lead a rational trier of fact to find the elements of the offense charged beyond a reasonable doubt. United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996). We review a district court's denial of a motion for a new trial for abuse of discretion. United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003). We also review evidentiary rulings for abuse of discretion. United States v. Lancaster, 78 F.3d 888, 896 (4th Cir. 1996).

Gall v. United States, 552 U.S. _____, 128 S.Ct. 586 (2007), has significantly changed our standard of review for district court sentences. Under Gall, we must first ensure that the district court

---

[1]The government has not challenged the reasonableness of these sentences.

committed no significant procedural error, such as failing to calculate, or improperly calculating, the advisory guideline range, treating the Guidelines as mandatory, or failing to consider statutory factors. 128 S.Ct. at 598. Legal questions, including the interpretation of the advisory Guidelines, are reviewed de novo, but factual findings are reviewed for clear error. Id.; United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008).

Provided that the district court committed no reversible procedural error, we consider the substantive reasonableness of the sentences imposed under an abuse of discretion standard. Gall, 128 S.Ct. at 598. In conducting our substantive reasonableness review, we look to the totality of the circumstances. Id.

IV.

Appellants appeal the district court's denial of their motions to dismiss and for a new trial based on the government's use of cooperator testimony that it allegedly knew to be false. They argue that the three heroin mules, Appau, Manu and Richardson, made inconsistent statements prior to trial and that their statements should have led the government to exclude them as witnesses at trial. According to Appellants, the government's failure to do so was an act of prosecutorial misconduct.[2]

_____

[2]Although not briefed, during oral argument Appellants contended that the district court had a constitutional duty to act as a "gatekeeper" to keep testimony of questionable veracity away

9

In reviewing a claim of prosecutorial misconduct, we must determine whether "the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002). In order to successfully raise a claim of prosecutorial misconduct based on perjured trial testimony, a defendant must first show that perjured testimony was used against him at trial. United States v. Griley, 814 F.2d 967, 970-71 (4th Cir. 1987). If the defendant meets this initial threshold inquiry, he must then show that the government knowingly used that perjured testimony to secure a conviction. Id.

Although a trial court in the exercise of its supervisory powers may dismiss an indictment in the face of prosecutorial misconduct that has prejudiced a defendant, we have indicated that this remedy is seldom appropriate. See United States v. Derrick, 163 F.3d 799, 807 (4th Cir. 1998). A new trial is only warranted in "the most egregious cases," and the dismissal of an indictment is only appropriate where even a new trial would be an insufficient remedy. Id. The trial court must balance the need to remedy the wrong against "thwart[ing] the public's interest in the enforcement

---

from the jury. We find this argument unavailing. The jury is the finder of fact in a trial and properly judges all credibility issues. Permitting them to weigh testimony of questionable veracity does not violate a defendant's due process rights. See, e.g., Washington v. Wilmore, 407 F.3d 274, 280 (4th Cir. 2005).

10

of its criminal laws in an even more profound and lasting way than the requirement of a retrial."  Id.

After examining the record of the trial, we conclude that, when viewed in the light most favorable to the government, the evidence could lead a reasonable trier of fact to find beyond a reasonable doubt that Appellants were involved in a conspiracy to import, distribute and possess one or more kilograms of heroin. Furthermore, even if Appellants' allegations are true, the government's conduct did not infect the trial with such unfairness as to violate Appellants' due process rights.

Although they couch their claim as one of prosecutorial misconduct, at bottom Appellants contend that the trial testimony of Appau, Manu and Richardson was not credible.  Before trial, however, Appellants knew of the inconsistent statements and chose to use them extensively at trial for impeachment purposes.  Despite that, the testimony of the heroin mules was supported both by physical evidence as well as the testimony of other witnesses.  As the trier of fact, the jury weighed the competing evidence and found the government's witnesses and evidence more credible. Consequently, Appellants cannot establish that the challenged testimony was perjured and therefore fail to meet the first prong of Griley.

11

V.

Appellants next allege that the district court abused its discretion by allowing Appau, Manu and Richardson to testify that Appellants had threatened them and other members of the conspiracy in order to keep them from talking to the police. They assert that such evidence was inadmissible under Fed. R. Evid. 403 because it lacked probative value. Moreover, they argue that even if such value existed it was substantially outweighed by the danger of unfair prejudice and the fact that it was intended to inflame the passions of the jury.

There is no dispute that Appellants failed to object to this testimony during trial. Consequently, before considering the merits of their argument, we must first determine whether the admission of this testimony constitutes plain error. United States v. Brewer, 1 F.3d 1430, 1434 (4th Cir. 1993).

Pursuant to Fed. R. Evid. 403, a trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have previously stated that evidence of threats against a witness is to be admitted with "great caution." United States v. Melia, 691 F.2d 672, 675 (4th Cir. 1982).

12

Fed. R. Crim. P. 52(b) allows an appellate court to correct "plain errors," even when those errors are not preserved at the trial level. To reverse a conviction for plain error, however, we must (1) identify an error which (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity or public reputation of judicial proceedings. Brewer, 1 F.3d at 1434-35. To establish that the error affected substantial rights, a defendant bears the burden of demonstrating that he was prejudiced by the error. United States v. Hastings, 134 F.3d 235, 239 (4th Cir. 1998).

A trial court is accorded "broad deference" with respect to its evidentiary decisions, including whether such evidence is probative or unduly prejudicial. United States v. Myers, 280 F.3d 407, 413 (4th Cir. 2002). From our review of the record, it is apparent that Appellants not only failed to object at trial to the testimony about the threats but also used that testimony on cross-examination to undermine the credibility of Appau by questioning him extensively about such threats. It is difficult to see how Appellants were prejudiced when, as a matter of trial strategy, they chose to use the testimony as a sword to attack the credibility of one of the government's witnesses. Because Appellants were not prejudiced, the admission of this testimony, even if erroneous, does not constitute plain error.

VI.

The third issue raised by Appellants concerns whether the district court erred when it allowed ICE Special Agent Brendan Cullen ("Cullen") to testify that, in his experience, drug couriers often give false information to law enforcement when they are first apprehended. Appellants assert that Cullen's opinion is inadmissible under Fed. R. Evid. 701 because he was not testifying as an expert witness.

Fed. R. Evid. 701, which governs fact witness testimony, states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Lancaster, 78 F.3d at 896.

The testimony to which Appellants object occurred on re-direct examination after defense counsel, on cross-examination, asked Cullen a series of probing questions about his decision-making process. For example, counsel pressed Cullen as to why he had not used Manu as an undercover informant. When Cullen responded that Manu had made several inconsistent statements at the time of his arrest, counsel then inquired whether Cullen had followed up on certain false investigative leads provided by Manu, and whether he believed Manu had understood the terms of a proffer letter. He also

14

asked why Cullen had not alerted federal prosecutors when Manu provided new, inconsistent information following the proffer letter. The clear purpose of these questions was to probe Cullen's own perceptions, beliefs and decisions with respect to the investigation.

Appellants' trial strategy obviously was to place Cullen's investigative methods at issue, including his decision not to use Manu as an undercover operative. The government therefore was entitled on re-direct to elicit from Cullen that, in his personal experience, it was not uncommon for drug couriers to lie when initially confronted by the police. Since Appellants had attempted to cast doubt on Cullen's competency to handle various aspects of the investigation, the government on re-direct could fairly establish that, in Cullen's experience, what had happened in this case was not unusual.

The testimony at issue related to Cullen's own experiences in drug investigations, not his expert opinion on drug investigations in general, and it came only after Appellants' counsel had opened the door on cross-examination. Moreover, the district court very carefully limited the scope of the government's inquiry on redirect. It never permitted the government to ask Cullen whether he believed the heroin mules were truthful, whether they had lied in the past or whether they should be believed. The district court, therefore, did not abuse its discretion when it permitted

15

the government to elicit testimony from Cullen regarding his experience with drug couriers.

## VII.

### A.

Appellants next contend that the district court erred in determining that Boateng was a supervisor in the drug conspiracy, a decision that made her ineligible for a two-level statutory safety valve reduction under Guideline § 2D1.1(b)(11).

Guideline § 3B1.1(c) provides for a two-level adjustment whenever a defendant acts as an organizer, leader, supervisor or manager of one or more participants in criminal activity. Application Note 2 to that Guideline states that

> [t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

Application Note 4 states that

> [f]actors the court should consider [when applying this adjustment] include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

16

As noted earlier, we review legal questions, including interpretation of the Guidelines, <u>de novo</u> but review underlying factual findings for clear error. <u>Abu Ali</u>, 528 F.3d at 261.

B.

In drug cases, "control" over others is a key factor in determining whether an adjustment under § 3B1.1(c) is proper. <u>United States v. Harriott</u>, 976 F.2d 198, 202 (4th Cir. 1992). Examples of control include instructing couriers, making travel arrangements or otherwise directing another person's activities. <u>Id.</u> At sentencing, the district court heard extensive argument about whether Boateng met the requirements for a supervisory role adjustment. Initially, the government had sought a four-level adjustment for Boateng as a leader or organizer of criminal activity with five or more participants. The district court rejected that argument because the government could not name five persons involved in Boateng's criminal activity. Nevertheless, because Boateng had acted as a contact for Appau, instructed him on how to pass the pellets, secured a hotel room for him, paid for his services and asked him to make another trip, the court concluded she had supervised one or more other participants in the conspiracy and should receive a two-level adjustment for supervisory role pursuant to § 3B1.1(c).

In support of its finding, the district court noted Appau had testified at trial that, when he arrived in the United States,

17

Boateng contacted him at the hotel and informed him "she is the one [he was] coming to see." She told him to stay in the hotel room and provided him with $500 to pay his expenses. She gave him her phone number and instructed him to contact her when he passed the heroin pellets. Boateng acted as Appau's sole contact during his stay in the United States. She also attempted to recruit him to carry money back to Ghana and later called him in Ghana to persuade him to chance another drug run into BWI.

The district court did not clearly err in applying the two-level adjustment for supervisory role pursuant to Guideline § 3B1.1(c) to Boateng. Application Note 2 recognizes that defendants who supervise one or more other participants in any criminal activity qualify for the adjustment. Although Boateng argues she was not a supervisor because there were others above her in the hierarchy, her argument is unavailing. The advisory Guidelines recognize that relative degrees of responsibility may exist within the same criminal activity. As in a lawful enterprise, an illegal enterprise may contain multiple levels of management. U.S.S.G. § 3B1.1 Application Note 4.

C.

The statutory safety valve entitles a defendant to a reduction of two levels below the base offense level and waives any statutory minimum sentence provisions if the defendant meets the following five criteria: (1) the defendant must have no more than one

18

criminal history point; (2) the defendant must not have used violence or credible threats of violence or possession of a firearm or a dangerous weapon during the offense; (3) the offense must not have resulted in death or serious bodily harm to any person; (4) the defendant must not have been a supervisor in the offense; and (5) prior to sentencing, the defendant must have "truthfully provided to the Government all information and evidence the Defendant has concerning the offense." 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. Because Boateng played a supervisory role in the offense, the district court properly concluded she was ineligible for the safety valve.

## VIII.

Appellants argue that the government failed to carry its burden of proving, by a preponderance of the evidence, that Bonsu committed perjury prior to trial. They contend the district court erred by applying the adjustment for obstruction of justice pursuant to Guideline § 3C1.1 without first determining whether Bonsu's statement was material. They also assert it failed to address whether the alleged perjury was done willfully for the purpose of deceiving the court.

U.S.S.G. § 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and

19

> (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense level, increase the offense level by 2 levels.

According to Application Note 4, the type of conduct to which this adjustment is intended to apply includes "committing, suborning or attempting to suborn perjury [and] providing materially false information to a judge or magistrate."  Material evidence is "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Application Note 6.

In order to adjust a defendant's base offense level for obstruction on the basis of perjury, a district court must first identify the allegedly false statements.  United States v. Akinkoye, 185 F.3d 192, 205 (4th Cir. 1999).  It then must determine whether the defendant (1) gave false testimony, (2) concerning a material matter, and (3) with the willful intent to deceive (as opposed to confusion, mistake, or faulty memory). United States v. Quinn, 359 F.3d 666, 680 (4th Cir. 2004).

In this case, the district court found that Bonsu's perjury occurred when he testified at the hearing on his motion to suppress that law enforcement had not advised him of his Miranda rights before he made certain incriminating statements. The trial court specifically found that: (1) Bonsu had testified falsely when, during the suppression hearing, he stated he had not been read his Miranda rights before his interrogation; (2) Bonsu's testimony was

20

material because it related to whether his statements should be suppressed; and (3) Bonsu had perjured himself willfully in order to suppress inculpatory statements he had given to government agents.

In its findings, the district court recognized that not every false statement is perjury, nor is every false statement entitled to an adjustment under the guidelines. United States v. Smith, 62 F.3d 641, 647 (4th Cir. 1995). It noted that some false statements are merely the result of faulty memory. Id. at 646. In Bonsu's case, however, it found that his statements "went beyond that." Not only had Bonsu testified that a government special agent had failed to read him his Miranda rights, he also testified the agent actually told him whatever he said could not be used in court. After weighing this evidence, the district court concluded that Bonsu's testimony conflicted with that of the agent to such a degree that either Bonsu or the agent had lied. The court then found the agent's testimony credible.

The district court did not abuse it discretion when it found that Bonsu's testimony was false and material, and that he had lied willfully to secure suppression of his statements by deception. It therefore properly applied Guideline § 3C1.1 in Bonsu's case.

21

Finally, Appellants contend the district court erroneously increased Bonsu's base offense level by three levels pursuant to Guideline § 3B1.1(b) because he was a supervisor or manager within a conspiracy of five or more participants. According to Appellants, the district court failed to make specific evidentiary findings to support its conclusion.

Guideline § 3B1.1(b) provides that a defendant who supervises or manages a criminal activity involving five or more participants qualifies for a three-level adjustment to the advisory Guideline level. As noted earlier, in drug cases we consider "control" over others a key factor in determining whether to apply this adjustment for supervisory role. Harriott, 976 F.2d at 202. Here, the district court found that Bonsu's modus operandi with Manu clearly resembled Boateng's method of dealing with Appau. Bonsu ordered Manu to remain in a hotel room, collected heroin pellets after Manu passed them and paid him for his services. The district court found that five or more participants were involved in the conspiracy with Bonsu when, at sentencing, he testified that another previously unknown co-conspirator named Steve had been on the telephone with one of the other heroin mules, Appau, during two of the calls. Based on that admission, and the evidence of Bonsu's relationship to Boateng, Appau, Manu and Richardson, the district

court determined that Bonsu had supervised five or more participants in the conspiracy pursuant to Guideline § 3B1.1(b).

These factual determinations about Bonsu's supervisory role in the conspiracy were not clearly erroneous. At trial, Manu had testified that Bonsu was "the boss" who had paid him for carrying the drugs, that Bonsu had met him at the airport and driven him to the hotel, that Bonsu had paid for his hotel room and directed him to stay in his room until he passed the heroin pellets. Based on this testimony, an adequate factual basis existed for the district court to apply the three-level adjustment pursuant to Guideline § 3B1.1(b).

X.

For the foregoing reasons, the judgment of the district court in this case is in all respects

AFFIRMED.

23