341 Conn. 233 FEBRUARY, 2022 233

State *v.* Bermudez

## STATE OF CONNECTICUT *v.* NOEL BERMUDEZ
## (SC 20461)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of felony murder, the defendant
appealed. The defendant and his brothers, S and B, had robbed the
victim as he returned home at night after closing the bar he owned,
during or after which the victim was shot and killed. Twelve years after
the incident, A, the estranged wife of S, provided a written statement
to the police that implicated the defendant and his brothers in the
victim's death. A, who knew that the defendant and his brothers were
affiliated with gangs, delayed providing information to the police, pur-
portedly out of fear that the defendant and his brothers would retaliate
against her or her family. S had regularly abused A throughout their
marriage and, following the victim's murder, had threatened to kill her,
their children, and A's mother. While the defendant was incarcerated
on unrelated charges during the twelve years after the shooting, he
instructed A to write salacious letters to him so that he could discredit
her if she were to testify against him. At trial, A's testimony was crucial
to the state's case, and, therefore, the reason for her twelve year delay
in coming forward and the credibility of her statement inculpating the
defendant and his brothers were central issues. In affirming the defen-
dant's conviction, the Appellate Court rejected the defendant's claim
that the trial court had improperly admitted evidence that he and his
brothers were affiliated with gangs and that A and her children had
been relocated by the state following her statement to the police. The
Appellate Court also rejected the defendant's claim that his constitu-
tional rights to present a defense and to confront the witnesses against
him was violated insofar as the trial court declined to admit into evidence
the letters that A had sent to the defendant and precluded defense
counsel from questioning A about the circumstances surrounding the
termination of her employment from a hospital and her birth control
practices. On the granting of certification, the defendant appealed to
this court, renewing the evidentiary claims that he raised in the Appellate
Court. *Held*:

1. The Appellate Court correctly concluded that the trial court had not
abused its discretion in admitting, through A's testimony, evidence of
the gang affiliations of the defendant and his brothers: that evidence
was probative of the reason why A feared the defendant and his brothers
and why she waited twelve years before providing her statement to the
police, and that evidence was not merely cumulative of other evidence,
as it was the only evidence that explained why A feared not only S, but

State *v.* Bermudez

the defendant and B as well, why she feared retaliation from individuals acting on their behalf, and why she believed that there was no place she could go where she would be safely out of their reach, even while they were incarcerated for unrelated charges or convictions; moreover, the trial court minimized the prejudicial impact of the evidence by twice instructing the jury that it could consider it solely in evaluating A's credibility as to why she waited twelve years before coming forward and by barring any other witness from testifying that the defendant and his brothers were affiliated with gangs; furthermore, A's testimony on this issue was relatively brief, and the prosecutor made only a brief reference to it in his closing argument.

2. The Appellate Court correctly concluded that the trial court had not abused its discretion in admitting, through A's testimony on direct examination, evidence of the state's relocation of A and her children following her statement to the police; that evidence was highly relevant to A's claimed fear of the defendant and his brothers and to demonstrate that her fear remained even after they were incarcerated, which was a central focus of defense counsel's efforts to impeach A's credibility, as the jury reasonably could have concluded that A's willingness to subject herself to the upheaval and disruption of moving herself and her children multiple times was credible evidence of her belief that she and her family were not safe and that A's relocation explained her willingness to testify against the defendant and his brothers, despite her long-standing fear of retaliation; moreover, the state did not exploit the relocation evidence, as A's testimony on the issue was relatively brief, the questions posed to her and her responses thereto did not directly implicate the state in a way that might suggest that the prosecutor was vouching for her credibility, and the prosecutor made only a brief reference to it during closing argument; furthermore, the evidence was not presented in such a way as to suggest that A was in the state's witness protection program because of direct threats by the defendant.

3. The trial court did not abuse its discretion in determining that the prejudicial effect of the salacious letters that A had written to the defendant outweighed their probative value, and, therefore, the defendant could not establish that his constitutional rights to present a defense and to confront the witnesses against him were violated by that court's decision to preclude the letters from being admitted: the sexually graphic language used in the letters and, more generally, the letters themselves, lacked probative value, and, although the trial court treated the letters as independently probative of whether A was fearful of the defendant, the admission of the letters was not necessary to prove that A was not fearful of the defendant, as she essentially admitted that she had a good relationship with him and had no reason to fear him, as long as she did not inculpate him in the crime; moreover, to the extent that the defendant claimed that the trial court's exclusion of the letters deprived him of

State *v.* Bermudez

the opportunity to effectively impeach A's credibility, he failed to demonstrate how the specific contents of the letters bore on that issue.

4. The Appellate Court correctly concluded that the defendant's claim that his constitutional rights were violated insofar as the trial court precluded defense counsel from questioning A about the circumstances surrounding the termination of her employment from a hospital and her birth control practices was not constitutional in nature and that the trial court did not abuse its discretion in precluding these two lines of inquiry: the trial court correctly concluded that the circumstances surrounding the termination of A's employment were simply too remote and would have injected a collateral issue into the trial and that further inquiry into A's birth control practices, after defense counsel questioned her about why she continued to have children with S after the victim's murder, would have inappropriately focused on a matter far too attenuated from the material issues in the case; moreover, even if this court concluded that the trial court should have permitted some inquiry into these two matters, such error was harmless because the defendant had ample opportunity at trial to impeach A with respect to her purported fear of S and those lines of inquiry were merely cumulative of other evidence calling into question the genuineness of that fear.

Argued February 18—officially released November 3, 2021*

*Procedural History*

Substitute information charging the defendant with the crimes of murder and felony murder, brought to the Superior Court in the judicial district of Waterbury, where the court, *K. Murphy, J.*, granted the state's motion to preclude certain evidence and granted in part the defendant's motion to preclude certain evidence; thereafter, the case was tried to the jury before *K. Murphy, J.*; verdict of guilty of felony murder; subsequently, the court, *K. Murphy, J.*, declared a mistrial as to the charge of murder, dismissed the charge of murder, and rendered judgment of guilty of felony murder, from which the defendant appealed to this court, which transferred the appeal to the Appellate Court, *Elgo, Moll* and *Devlin, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

* November 3, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Bermudez

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Don E. Therkildsen, Jr.*, and *Cynthia S. Serafini*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Noel Bermudez, appeals, following our grant of certification, from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant claims that the Appellate Court should have reversed the judgment of conviction and ordered a new trial in light of the trial court's rulings (1) admitting testimony regarding the gang affiliations of the defendant and his two brothers and the state's relocation of its chief witness, Damaris Algarin-Santiago (Algarin),[1] after she provided a statement to the police incriminating the defendant and the brothers in the murder, (2) excluding from evidence salacious letters written by Algarin to the defendant while he was imprisoned, and (3) preventing the defendant from questioning Algarin about the circumstances surrounding the termination of her employment from Waterbury Hospital and her birth control practices. The defendant contends that the trial court's rulings excluding Algarin's letters and precluding his inquiry into her termination and birth control practices violated his rights to confrontation and to present a defense under the sixth and fourteenth amendments to the United States constitution, and that all of the rulings constituted harmful error requiring

[1] For purposes of clarity, we refer in this opinion to Algarin-Santiago as Algarin to distinguish her from her estranged husband, Victor Santiago.

State *v.* Bermudez

a new trial. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, which the jury reasonably could have found, and procedural history. "In the early hours of April 11, 1998, Wilfred Morales, the owner of Morales Café, was closing his bar for the night. As part of his routine, Morales counted the cash and checks he received from the patrons and placed the proceeds in a blue bank bag. At approximately 2:30 a.m. that morning, Morales was shot and killed on a street near his home in Waterbury.

"Twelve years later, [Algarin], the estranged wife of the defendant's brother, Victor Santiago, provided a written statement to the police. In that statement, Algarin implicated the defendant, Santiago, and another brother of the defendant, Thomas Bonilla, in Morales' death. The defendant ultimately was charged with the murder of Morales.

"Algarin was the state's chief witness in its prosecution of the defendant. Algarin testified that she had been in a relationship with Santiago since [graduating from the eighth grade in] 1993 and that they eventually married in 2004.[2] Throughout their time together, Santiago abused Algarin on a regular basis, both physically and emotionally. The couple had two children at the time of Morales' murder [and had two more children together thereafter].

"In her testimony at trial, Algarin [offered the following account of] the events of April 11, 1998. At approximately 3 a.m., Algarin was awakened by Santiago, who was screaming at her to come downstairs. Upon doing

_____

[2] "Algarin testified that the two married so that she would not be able to testify against Santiago." *State* v. *Bermudez*, 195 Conn. App. 780, 784 n.3, 228 A.3d 96 (2020).

State *v.* Bermudez

so, Algarin saw a coffee table full of money, checks,[3] and a blue leather bag with a zipper. She also saw Bonilla counting the checks and cash as the defendant dismantled a pistol in the kitchen and Santiago cleaned the pistol parts with baby oil to remove fingerprints. When Algarin asked what had happened, Santiago immediately started to beat her. The three brothers continued to argue about what had transpired and were upset about the number of checks relative to the amount of cash. Algarin again asked what had happened, and the defendant responded that they had shot Morales.'' (Footnote omitted; footnotes in original.) *State* v. *Bermudez*, 195 Conn. App. 780, 784–85, 228 A.3d 96 (2020).

Algarin learned the following details about the crime from the defendant and his brothers. ''[T]he defendant and his . . . brothers were in need of money and thus sought to rob Morales that night, believing that the Good Friday holiday would result in a large amount of cash. To become familiar with Morales' routine . . . Santiago stalked Morales for some time. . . . Santiago planned to act as the driver [and to have] Bonilla and the defendant . . . commit the robbery. When Bonilla and the defendant confronted Morales on the night in question, the defendant shot him to death. The defendant gave Algarin two explanations for doing so: (1) he believed [that] Morales was reaching for a gun, and (2) he wanted revenge due to his belief that Morales had shot Santiago some years earlier.''[4] Id., 785.

_____

[3] ''Algarin testified that she recognized some of these checks as Social Security checks.'' *State* v. *Bermudez*, 195 Conn. App. 780, 784 n.4, 228 A.3d 96 (2020).

[4] There was evidence that, as a consequence of this incident, the state brought criminal charges against Morales, and Santiago later initiated a civil action against him. ''Santiago was frustrated that Morales had been acquitted of shooting him and was further enraged that his civil action against [him] was unlikely to result in a large monetary [award].'' *State* v. *Bermudez*, supra, 195 Conn. App. 785 n.5.

State *v.* Bermudez

Algarin then observed the defendant and his brothers undertake the following activities to dispose of evidence of the crime. "Upon arriving at Algarin's home after the shooting, the defendant and his brothers burned the checks in the kitchen sink,[5] cleaned the weapons of fingerprints, and placed the dismantled pistol parts into three separate bags. . . . [They also] burned their clothing in a barrel behind the house and cleaned the car to remove gun residue. . . . When [Algarin] refused [Santiago's demand] to go with him to dispose of the bags filled with the gun parts, Santiago . . . beat Algarin until the defendant intervened. Reluctantly, [Algarin] agreed [to] accompan[y] Santiago to dispose of the bags. When the [last] bag was thrown into the Naugatuck River, Santiago . . . threatened to kill Algarin, her mother, and their children, stating . . . '[n]ow you know what we're capable of.' " (Footnote in original.) Id., 785–86.

"Later that day, Santiago and Bonilla accompanied Algarin to deposit the [stolen] cash into her bank account via an automated teller machine (ATM). Algarin . . . deposited three separate envelopes of cash, which she believed to have totaled $3000. . . . [T]he following Monday, Santiago and Bonilla went with Algarin to make a withdrawal, at which time Algarin gave the cash to Santiago. [At some point during the aftermath of the murder, the defendant and his brothers concocted an alibi that they and Algarin had been celebrating Bonilla's return from prison by eating fish for Good Friday at their mother's home.]

"[Between] 1998 [and] 2010, Algarin was questioned by the police on approximately seven occasions. Each time, she stuck to the manufactured alibi out of fear

---

[5] "The [defendant and his] brothers decided to burn the checks after Algarin refused to deposit them in her account." *State* v. *Bermudez*, supra, 195 Conn. App. 785 n.6.

State *v.* Bermudez

for her safety and the safety of her family. Knowing that the defendant, Santiago, and Bonilla were affiliated with nationwide gangs,[6] Algarin was particularly afraid of reprisals should she provide the police with any information. During this period, however, she did divulge some information to three people. Approximately one year after Morales' murder, Algarin revealed to Ralph C. Crozier, an attorney whom she knew, that the defendant and his two brothers had been involved in the homicide.[7] She also provided details of the homicide to Sally Roden-Timko, a coworker at Waterbury Hospital, who . . . confirm[ed] the [conversation] in a statement given to the police in 2010.[8] Algarin later discussed details about the homicide with Luis Maldonado, a person she began dating in 2009 while Santiago was incarcerated for an unrelated matter.

"Despite being incarcerated throughout much of the twelve year interval [between the murder and Algarin's statement to the police], Santiago continued to threaten Algarin. After a newspaper article was published on the [reopening of the] investigation into Morales' murder, the defendant, who was also incarcerated on an unre-

---

[6] "Algarin testified that the defendant and Santiago were members of the Latin Kings, while Bonilla was a member of 'Netas.' " *State* v. *Bermudez*, supra, 195 Conn. App. 786 n.7.

[7] "Crozier had represented Algarin, the defendant, Santiago, and various family members [in] numerous matters prior to the 1998 murder of Morales. In fact, Crozier represented Santiago in his civil action against Morales. Crozier also testified that Algarin attempted to get away from Santiago on multiple occasions and that she stayed with Santiago because she feared him. He also stated that, had Algarin gone to the police with information about the murder, 'she would have definitely been murdered, based on who the people were.' " *State* v. *Bermudez*, supra, 195 Conn. App. 786 n.8.

[8] At trial, Roden-Timko repudiated the statement she had given to the police. The jury was permitted to credit her prior statement under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), in which we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination.

State *v.* Bermudez

lated criminal matter . . . instructed Algarin to write [him] three letters that were intimate and particularly salacious in nature. The defendant had requested the letters for the [stated] purpose of discrediting Algarin in the event that she were ever to testify against him.[9]

"In 2010, Maldonado was arrested in connection with an unrelated crime. Following his arrest, Maldonado provided the police with details about Morales' murder and further indicated that Algarin could provide more information. Algarin subsequently was visited by a detective from the Waterbury Police Department and taken to the police department [for questioning]. Fearing that Maldonado had disclosed information and concerned that he would be murdered by Santiago if he were incarcerated, Algarin abandoned the [brothers'] alibi [that she had maintained for twelve years] and provided a seven page statement to the police detailing the events of Morales' murder.

"On February 16, 2017, the defendant was charged by substitute information with one count of murder in violation of General Statutes § 53a-54a and one count of felony murder in violation of § 53a-54c." (Footnote added; footnotes in original.) Id., 786–87.

At trial, Algarin's testimony was the linchpin of the state's case, although the state also produced other corroborative evidence. The reason for Algarin's recantation of her prior statements supporting the brothers' alibi after many years and, in turn, the credibility of her detailed account inculpating them were thus the central issues in the case. The state presented evidence to support the theory that Algarin had been fearful of retribution against her, her family, and, later, Maldo-

_____

[9] "Algarin also wrote a series of letters to Santiago during his incarceration for an unrelated matter. These letters did not contain the sexually graphic content found in the letters she wrote to the defendant." *State* v. *Bermudez*, supra, 195 Conn. App. 787 n.9.

State *v.* Bermudez

nado because of Santiago's past physical abuse and threats, and the three brothers' gang affiliations. Algarin also testified that she had been relocated after she gave her statement to the police.

The defendant attempted to cast doubt on the state's theory through evidence demonstrating that Algarin's belated inculpation of the defendant and his brothers was not a product of fear but a desire for revenge. The defendant proffered evidence demonstrating that Algarin and Santiago had, and were perceived by others to have, a loving relationship.[10] He also elicited admissions from Algarin that she had written three salacious letters to the defendant while he was in prison, although she claimed that the defendant had directed her to write them, after the police reopened their investigation into the victim's murder, to use as an insurance policy against her disclosing her knowledge about the crime. The defendant argued that Algarin changed stories for revenge against Santiago after he ended their relationship as a consequence of the defendant's disclosing the letters to him.[11]

---

[10] The defendant adduced evidence that, in the years following the victim's murder, Algarin had written Santiago love letters and sent him money whenever he was imprisoned. Attorney Norman A. Pattis and a bail bondsman, Ismael Santiago, testified that, in their professional experiences working with Santiago and Algarin on unrelated matters, the couple appeared to have a normal, loving, and nonabusive relationship. Defense counsel also argued that, when Algarin had dated another man during one of Santiago's stints in prison in the early 2000s, Santiago did not threaten to kill Algarin or her boyfriend.

[11] Defense counsel argued: "[Algarin] spent [sixteen] years of her life with [Santiago]. She was committed to him despite his problems. Why would she leave him? . . . We submit that [Santiago] found out . . . about the sexually explicit letters . . . and he broke up with her after he found out that she was writing these sexually explicit letters to [the defendant], and . . . what happened then? He broke up with her, and she was alone in her life after [sixteen] years with [Santiago], and she weaved this tale with the help of [the police] . . . for revenge on [Santiago] for ending the relationship, and she got a $50,000 bonus to start a new life, and she also was able to [exact] her revenge on [the defendant] for sending the letters [to Santiago] . . . ."

State *v.* Bermudez

During its rebuttal closing argument, the state countered the defendant's claim that Algarin, in 2010, had implicated the defendant in the victim's murder out of spite, pointing to evidence that Algarin had told Crozier about the murder shortly after it occurred in 1998 and that she had told a friend about it a few years after that.

The jury found the defendant guilty of felony murder but deadlocked on the charge of murder. *State* v. *Bermudez*, supra, 195 Conn. App. 787–88. The trial court declared a mistrial on that charge[12] and, thereafter, sentenced the defendant to a total effective term of sixty years of incarceration. Id. 788.

The defendant appealed from his conviction to the Appellate Court, claiming, among other things, that certain of the trial court's evidentiary rulings constituted harmful error that deprived him of a fair trial. See id., 783, 788. Specifically, the defendant contended that the trial court improperly admitted unduly prejudicial evidence of his and his brothers' gang affiliations and of Algarin's relocation by the state following her statement to the police. See id., 788. The defendant further claimed that the trial court violated his constitutional rights to present a defense and to confront witnesses against him by refusing to admit into evidence the three sexually explicit letters Algarin had sent to him in prison and by precluding him from questioning Algarin about two matters that he claimed undermined her purported fear of Santiago—the circumstances surrounding the termination of her employment from Waterbury Hospital and her birth control practices during the period of her marriage following the victim's murder. See id., 783, 805–806. In a thorough and comprehensive decision, the Appellate Court rejected in turn each of these claims, concluding that none of the claimed errors was constitu-

---

[12] The trial court ultimately dismissed the murder charge. See *State* v. *Bermudez*, supra, 195 Conn. App. 788 n.10.

State *v.* Bermudez

tional in nature and that most of the rulings were not
an abuse of the trial court's discretion. See id., 788–820.
Two of the trial court's rulings, however, presented a
closer question. The Appellate Court concluded that
the probative value of evidence of Algarin's relocation
by the state outweighed any undue prejudice but that,
even if the evidence was improperly admitted, its admis-
sion was harmless error. Id., 802–804 and n.19. The
Appellate Court also concluded that exclusion of the
sexually explicit letters was improper but that it was
harmless evidentiary error given the extensive testi-
mony about them. Id., 813–17.

The Appellate Court therefore affirmed the judgment
of conviction; Id., 827; and this certified appeal fol-
lowed. On appeal, the defendant renews his evidentiary
claims raised in the Appellate Court.[13] For the reasons
set forth hereinafter, we conclude that the Appellate
Court properly affirmed the judgment of conviction.

I

We begin with the defendant's claims that he con-
cedes are not constitutional in nature. The defendant
contends that the Appellate Court incorrectly deter-
mined that the trial court had properly admitted evi-
dence of (1) his and his brothers' gang affiliations, and
(2) Algarin's relocation by the state following her state-

---

[13] This court granted the defendant's petition for certification to appeal,
limited to the following issues: (1) "Did the Appellate Court properly uphold
the trial court's admission of evidence that the defendant was a gang member
and that the state's chief witness was relocated out of state after providing
her statement to the police inculpating the defendant?" (2) "Did the Appellate
Court correctly conclude that the trial court's erroneous preclusion of sexu-
ally explicit letters the state's chief witness wrote to the defendant was
harmless and that the trial court's limitation on the defendant's cross-exami-
nation of her was proper?" And (3) "[d]id the Appellate Court properly
uphold the trial court's rulings limiting the defendant's cross-examination
of the state's chief witness on topics regarding her credibility?" *State* v.
*Bermudez*, 335 Conn. 908, 227 A.3d 521 (2020).

State *v.* Bermudez

ment to the police inculpating the defendant and his brothers in the victim's murder.

"Our standard of review for evidentiary claims is well settled. To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76 (2010). Because the defendant challenges the application and not the interpretation of our rules of evidence, the trial court's rulings as to this evidence are reviewed for an abuse of discretion. "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling[s] [on these bases] . . . ." (Citation omitted; internal quotation marks omitted.) Id., 11.

A

We turn first to the defendant's claim that the trial court abused its discretion in admitting evidence of his and his brothers' gang affiliations because its prejudicial effect outweighed any probative value. Although the defendant does not dispute that this evidence was relevant to Algarin's claimed fear of him and his brothers, he argues that it was of limited probative value because it was merely cumulative of other evidence of her state of mind. He further argues that, contrary to the Appellate Court's conclusion, the trial court's limiting instruction did not dissipate the highly prejudicial impact of this evidence. We agree with the Appellate Court's resolution of this issue.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "Prior

State *v.* Bermudez

to his trial, the defendant filed a motion in limine in response to the state's notice of its intent to introduce evidence of the [defendant's and his brothers'] gang affiliations. Specifically, the state sought to introduce testimony from Algarin that the defendant and Santiago were members of the Latin Kings gang. The purpose of this testimony, the state argued, was to illustrate the extent to which Algarin feared retaliation from Santiago, the defendant, or other gang members. According to the state, Algarin's fear of the defendant and his brothers bore directly on her reason for waiting twelve years to provide the police with inculpating evidence.

"After balancing the probative value of the evidence against the danger of unfair prejudice, the [trial] court allowed the testimony for the limited purpose proposed by the state. As the court explained, 'to the extent that the state is going to introduce evidence that . . . [Algarin] was afraid to disclose [what she knew about the crime] because . . . the defendant and/or . . . Santiago was a member of the Latin Kings street gang; that they are a group of people that have access to people in many places; and that they have access to weapons, I would allow it just for that purpose. I would not allow the introduction of that evidence to go to whether [the defendant] did this crime, and so I would [provide] a limiting instruction regarding the introduction of [the] evidence if [it] comes in as an explanation for her delay in disclosing this [crime].' " *State* v. *Bermudez*, supra, 195 Conn. App. 789.

The following exchange then ensued during the state's direct examination of Algarin:

"[The Prosecutor]: I think where we left off, you indicated that you were afraid, and that's why you decided to tell the police in 2010. What exactly were you afraid of?

"[Algarin]: I was afraid of their gang affiliations.

State *v.* Bermudez

"[The Prosecutor]: And when you say gang affiliations, who are you talking about?

"[Algarin]: I'm talking about all three of them.

"[The Prosecutor]: Okay. And when . . . you say gang affiliation, what exactly do you mean?

"[Algarin]: They're all in gangs. They're Latin Kings and Netas.

"[The Prosecutor]: Okay. Who was [a] Latin King?

"[Algarin]: [The defendant] and [Santiago].

"[The Prosecutor]: And . . . [Bonilla] was in Netas?

"[Algarin]: Yes.

"[The Prosecutor]: And why was that concerning to you?

"[Algarin]: Because of their past actions.

"[The Prosecutor]: Things that you had actually witnessed?

"[Algarin]: And heard, yes.

"[The Prosecutor]: And when you say heard, heard them talking about things that they had done?

"[Algarin]: Yes.

"[The Prosecutor]: And so, at that point in time, were you afraid just for yourself or for anyone else?

"[Algarin]: I was afraid for myself, my family, [Maldonado], my children, my mom, my brother. Everyone."

Later in the direct examination, the topic was referenced again in the following brief exchange:

"[The Prosecutor]: And, as you sit here today, are you still in fear of retaliation?

"[Algarin]: Absolutely.

State *v.* Bermudez

"[The Prosecutor]: By whom?

"[Algarin]: By all three of them and their gang affiliations.

"[The Prosecutor]: And you talked before about the Latin Kings, that [the] defendant and [Santiago] were members of the Latin Kings. Is that a group that's just found in Waterbury or is that found in other places as well? . . .

"[Algarin]: They're nationwide."

Immediately after this testimony, the court provided a limiting instruction and cautioned the jury that any evidence of gang affiliations was admitted only to show why Algarin delayed in coming forward or why she disclosed at a certain time. The court also provided a similar instruction in its final charge to the jury.[14]

Near the end of his closing argument, the prosecutor connected Algarin's twelve year delay in coming forward to the defendant's and his brothers' gang affiliations: "The delay in disclosure. Why did it take [twelve] years? We've talked about that. She was with . . . Santiago since her eighth grade graduation. She had a . . . child with him a year later, four children all together. She testified the abuse started early and . . . progressively got worse. He beat [her], financially abused [her], psychologically abused [her], pistol whipped [her], and broke [her] nose [when she burned French fries]. . . .

---

[14] During its final charge to the jury, the trial court reiterated this limitation in a lengthy instruction, emphasizing that this evidence could not be considered "as establishing a predisposition on the part of the defendant [and his brothers] to commit any of the crimes charged or to demonstrate a criminal propensity," and that it could be considered only to the extent that "it may bear on the issue of fear of [them] on the part of [Algarin], and some of her reasons for not immediately reporting her observations of April 11, 1998, and to explain the timing of her disclosure in 2010." The court further explained to the jury that it was not obligated to credit the evidence for this purpose.

State *v.* Bermudez

Do you think it's reasonable to believe that, if someone broke your nose over burnt French fries and . . . told you they were going to kill you if you [talked to the police] . . . that you'd believe [them]? Tried to leave multiple times. She had him . . . arrested. When he got out of jail . . . [he] beat her with a phone. . . .

"The night of the [murder] . . . [Santiago] beats her. Told her he was going to kill her mother and her kids. She knew he was a Latin King, a gang member . . . from things . . . he and . . . the defendant . . . had told her and she had seen. . . . Would you be afraid of that man? Would you be afraid of those other individuals? . . . She testified she believes the Latin Kings are a nationwide gang, and she is still afraid of them."

The following legal principles guide our analysis of the defendant's claim that admission of this evidence was harmful error. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities [or be conclusive] . . . ." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429, 64 A.3d 91 (2013). "All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) Id. Nonetheless, "relevant . . . evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defen-

State *v.* Bermudez

dant but whether it will improperly arouse the emotions of the [jurors]. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done.'' (Internal quotation marks omitted.) Id., 429–30.

We agree with the Appellate Court's thorough and persuasive analysis and conclusion that the trial court's admission of the gang affiliation evidence was not an abuse of discretion. See *State* v. *Bermudez*, supra, 195 Conn. App. 792–95. To be sure, courts must exercise caution whenever the state seeks to admit evidence of a defendant's affiliation with a gang. See, e.g., *United States* v. *Irvin*, 87 F.3d 860, 865 (7th Cir.) (''Gangs . . . often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict.''), cert. denied, 519 U.S. 903, 117 S. Ct. 259, 136 L. Ed. 2d 184 (1996); *Commonwealth* v. *Akara*, 465 Mass. 245, 267, 988 N.E.2d 430 (2013) (''urg[ing] caution in admitting [gang related] evidence . . . because evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence'' (internal quotation marks omitted)). This includes carefully evaluating the proffered purpose of the evidence to ensure its probative value is significant enough to overcome the potential for unfair prejudice. See, e.g., *State* v. *Pham*, 27 Kan. App. 2d 996, 1002, 10 P.3d 780 (2000) (''[a]lthough proof of a criminal defendant's membership in a street gang can always be described as prejudicial, it becomes grossly and unfairly so when it is not balanced by probative value of some significant magnitude''). Under no circumstance should the evidence be admitted to demonstrate the defendant's criminal propensity or bad character. See, e.g., *United States* v. *Street*, 548 F.3d

State *v.* Bermudez

618, 632 (8th Cir. 2008) (citing cases in which gang membership evidence was admitted and noting that in none of them "was [it] used to show criminal propensity or otherwise paint a defendant guilty through mere association"); *United States* v. *McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005) ("gang affiliation evidence is not admissible [when] it is meant merely to prejudice the defendant or [to] prove his guilt by association with unsavory characters"), cert. denied, 547 U.S. 1174, 126 S. Ct. 2345, 164 L. Ed. 2d 859 (2006), and cert. denied, 549 U.S. 828, 127 S. Ct. 46, 166 L. Ed. 2d 48 (2006).

Our appellate courts previously have held, however, that evidence of a defendant's gang affiliation is admissible when it is relevant to a material issue in the case, such as why a witness delayed in coming forward to the police; see *State* v. *Wilson*, supra, 308 Conn. 430; *State* v. *Cruz*, 56 Conn. App. 763, 771–72, 746 A.2d 196 (2000), aff'd, 260 Conn. 1, 792 A.2d 823 (2002); and, to the best of our knowledge, every other court has similarly held. See, e.g., *Blackmon* v. *Booker*, 696 F.3d 536, 555 (6th Cir. 2012) ("gang affiliation evidence tended to make the fact of witness bias in favor of [the] [p]etitioner based on fear more probable"), cert. denied, 568 U.S. 1217, 133 S. Ct. 1501, 185 L. Ed. 2d 557 (2013); *United States* v. *Jimenez*, Docket No. 94-2625, 1995 WL 135923, *3–4 (7th Cir. March 28, 1995) (defendant's membership in Latin Kings was admissible to question defense witness on whether fear of retaliation caused him to recant his prior statements to Federal Bureau of Investgation) (decision without published opinion, 51 F.3d 276), cert. denied, 516 U.S. 847, 116 S. Ct. 139, 133 L. Ed. 2d 86 (1995); *United States* v. *Keys*, 899 F.2d 983, 987–88 (10th Cir.) (because "[c]redibility was crucial to resolution of this case . . . evidence that the defense witnesses might have slanted their testimony because of their fear of [the defendant] and his fellow gang members had a high probative value"), cert.

State *v.* Bermudez

denied, 498 U.S. 858, 111 S. Ct. 160, 112 L. Ed. 2d 125 (1990); *United States ex rel. Garcia* v. *Lane*, 698 F.2d 900, 902 (7th Cir. 1983) (witness' testimony that he knew defendant was member of Latin Kings was properly admitted to explain his prior inconsistent statement due to fear of retaliation); *People* v. *Sanchez*, 58 Cal. App. 4th 1435, 1449, 69 Cal. Rptr. 2d 16 (1997) ("[Gang affiliation] evidence was properly admissible on the issue of witness credibility. Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible." (Internal quotation marks omitted.)); *State* v. *Dean*, 310 Kan. 848, 862, 450 P.3d 819 (2019) ("[w]e have held that gang affiliation evidence may be relevant to show bias, prove identity, or explain an otherwise inexplicable act, but these reasons are not exclusive"); *Commonwealth* v. *Holliday*, 450 Mass. 794, 814–15, 882 N.E.2d 309 (trial court properly admitted evidence demonstrating witnesses' fear of retaliation in gang related double homicide case to explain why they had failed to share information sooner), cert. denied sub nom. *Mooltrey* v. *Massachusetts*, 555 U.S. 947, 129 S. Ct. 399, 172 L. Ed. 2d 292 (2008); *State* v. *Trujillo*, 131 N.M. 709, 729–30, 42 P.3d 814 (2002) (undisputed evidence of defendant's gang affiliation was properly admitted because witness' "fear of retaliation went to his credibility, by showing that he had valid reasons—including the safety and well-being of himself and his family—for being less than candid about . . . [the] [d]efendant's involvement in the shooting"); *State* v. *Gonzalez*, 345 P.3d 1168, 1178 (Utah 2015) (gang related evidence was properly admitted to show "a key [witness'] fear of gang retaliation").

There can be no doubt that whether Algarin delayed providing the inculpatory information to the police because she was afraid of violence against her or her loved ones and whether there was a factual basis for any such fear for the period preceding her disclosure

State *v.* Bermudez

were probative of a material issue in the present case. We also agree with the Appellate Court that the challenged evidence was not merely cumulative of other evidence. See *State* v. *Bermudez*, supra, 195 Conn. App. 794. As that court explained, that other evidence consisted mainly of Algarin's testimony detailing Santiago's abuse of her, which did not explain why she would fear harm from the defendant and Bonilla, especially when there was evidence that neither had ever physically abused Algarin and that, in fact, the defendant had intervened "on multiple occasions" when Santiago abused her. Id., 794 and n.14. Nor did evidence of Santiago's abuse demonstrate why Algarin would fear retribution from the defendant and his brothers and continue to corroborate their false alibi, even during their long periods of incarceration, when they were not physically present to harm her. See id., 794. Evidence of their gang affiliations was the only evidence to explain why Algarin feared all three of them, why she feared retaliation from individuals acting on their behalf, and why she believed that there was no place she could go where she would be safely out of their reach, even when they were incarcerated.

As the Appellate Court also explained, the record reflects that the trial court was keenly aware of the potential for the evidence to inflame the jurors' emotions. See id., 794–95. To minimize its prejudicial impact, the trial court twice instructed the jury that it could consider the evidence solely in evaluating Algarin's credibility as to why she waited twelve years to come forward. The court also barred any other witness from mentioning the defendant's and his brothers' gang affiliations. We note, moreover, that Algarin's testimony regarding this matter was relatively brief in the context of her two days of testimony, and the prosecutor made only brief reference to it in closing argument. See, e.g., *State* v. *Wilson*, supra, 308 Conn. 430–31 (risk of unfair

State *v.* Bermudez

prejudice from gang related evidence was minimized when witness referred to gang only once during testimony and prosecutor did not refer to it during closing argument). In light of the foregoing, we agree with the Appellate Court that the trial court did not abuse its discretion in admitting the gang affiliation evidence.

B

We next address the defendant's claim that the trial court abused its discretion in admitting evidence that Algarin "was relocated," which necessarily implied that such action was undertaken by the state, after she inculpated the defendant and his brothers in the victim's murder. The defendant contends not only that the evidence was irrelevant to the issue of Algarin's credibility, but also that the trial court failed to recognize its highly inflammatory nature and, as a result, "did not properly balance the prejudicial effect of the evidence [with] its probative value . . . ." The defendant argues that courts in other jurisdictions recognize that "great care must be taken to protect against the very real possibility that the jury will infer [that] the witness was relocated as a result of threats by the defendant" and that the trial court in the present case, by failing to provide the jury with a limiting instruction, failed to exercise that level of care.

The state responds that the defendant's argument "fails to differentiate between evidence that is duly prejudicial and that which is unfair." (Emphasis omitted.) Specifically, the state contends that, "to the extent that Algarin's testimony implied that she feared the [defendant and his] brothers, it was duly prejudicial because it was highly probative of why she had corroborated their false alibi for twelve years." The state further contends that the relocation evidence was also probative of Algarin's credibility "in that it established [the] significant hardship that [she] endured as a result of

341 Conn. 233 FEBRUARY, 2022 255

State *v.* Bermudez

providing information [to the police],'' which courts
have held is relevant to a fact finder's assessment of a
witness' credibility. We agree with the state.

The opinion of the Appellate Court sets forth the
following relevant facts and procedural history. "At
trial, the prosecutor asked Algarin whether she contin-
ued to live in Waterbury after giving her statement to
the police. [Defense counsel] immediately objected,
believing that the prosecutor was about to elicit evi-
dence about [Algarin's participation in the state's] wit-
ness protection program. . . . Outside the presence of
the jury, [counsel] argued that any testimony regarding
Algarin's placement in the witness protection program
would be unduly prejudicial. [Counsel] further asserted
that this testimony 'emphasizes the fact that the govern-
ment agency, whether it's a state or federal, believes
[that Algarin] is in danger and [has] paid for her care
since the time of this so-called disclosure.' In response,
the [prosecutor] argued that evidence of Algarin's relo-
cation was probative of her fear of retaliation. The court
agreed that Algarin should not refer to the 'witness
protection program' but ruled that the [prosecutor]
could elicit details on how [Algarin's] life has been
impacted since the disclosure, including how she was
relocated at the state's expense. The court thereafter
instructed Algarin not to use the phrase, 'witness pro-
tection program.' Algarin subsequently testified that
she, her children, and Maldonado were relocated out
of the state [after she provided the statement to the
police] and [were] relocated numerous times [there-
after].[15] The [prosecutor] referenced this fact in . . .

[15] Algarin's testimony concerning her relocation proceeded as follows:

"[The Prosecutor]: After you gave the statement to the Waterbury police
in April of 2010, you never continued to live in Waterbury, did you?

"[Algarin]: No.

"[The Prosecutor]: And, in fact, you were relocated out of this state with
your four children, correct?

"[Algarin]: Yes.

"[The Prosecutor]: And Mr. Maldonado was relocated as well, correct?

256 FEBRUARY, 2022 341 Conn. 233

State *v.* Bermudez

closing argument, noting that Algarin was 'immediately relocated with her four children' after giving her statement to the police and that she was 'still in relocation, still in fear of the [defendant and his brothers].' '' (Citation omitted; footnote added; footnote omitted.) *State* v. *Bermudez*, supra, 195 Conn. App. 796.

The Appellate Court concluded that evidence of Algarin's relocation was "highly probative and relevant" to her fear of retaliation from the defendant and his brothers, which she claimed had prevented her from coming forward sooner. Id., 797. The court further observed that whether the trial court should have excluded the evidence as unduly prejudicial was a matter of first impression in this state. Id., 798. The Appellate Court thus looked to federal precedent for guidance; see id., 798–802; and, on the basis of that precedent, concluded that "the probative value of the relocation testimony was not outweighed by the prejudicial impact to the defendant." Id., 802. The Appellate Court expressed a concern that the prosecutor's use of the passive voice when questioning Algarin about her relocation; see footnote 15 of this opinion; "alluded to a third party, presumably the state, as having facilitated [the] relocation," but noted that this expression was not as prejudicial as "witness protection program" or "at state expense." (Internal quotation marks omitted.) *State* v. *Bermudez*, supra, 195 Conn. App. 801. The Appellate Court also opined that, rather than allow the state to present the relocation evidence during its direct examination of Algarin, "the better practice would have been for the [trial] court to instruct the [prosecutor] not to implicate [the state's] involvement in relocation efforts in any way on direct examination . . . [u]nless

"[Algarin]: Yes.

"[The Prosecutor]: And you were relocated on more than one occasion, correct?

"[Algarin]: Yes."

State *v.* Bermudez

and until further explication in rebuttal [was] triggered by the defense in cross-examination . . . .'' (Internal quotation marks omitted.) Id., 804. Despite these concerns, the Appellate Court concluded that, ''given both the passive and infrequent references to the witness protection program, as well as the absence of the prosecutor's exploitation of that evidence . . . the [trial] court did not abuse its discretion in allowing testimony that Algarin had been relocated.'' Id. We agree with the Appellate Court.

As that court explained, although an issue of first impression for this court, ''[a] number of federal . . . courts of appeals that have addressed the issue have cautioned that admitting evidence of a testifying witness' placement in a witness protection program 'must be handled delicately.' *United States* v. *Partin*, 552 F.2d 621, 645 (5th Cir.), cert. denied, 434 U.S. 903, 98 S. Ct. 298, 54 L. Ed. 2d 189 (1977); see also *United States* v. *Melia*, 691 F.2d 672, 675 (4th Cir. 1982) (evidence of witness' participation in witness protection program should be admitted 'with great caution').'' *State* v. *Bermudez*, supra, 195 Conn. App. 798. The concern with admitting evidence of this nature is that it implies to the jury that the witness needed protection from the defendant and tends to bolster the witness' credibility by raising the inference that the witness' testimony must be truthful because she would neither need nor be afforded protection if she were the source of false information. See *United States* v. *Adamo*, 742 F.2d 927, 944 (6th Cir. 1984), cert. denied sub nom. *Freeman* v. *United States*, 469 U.S. 1193, 105 S. Ct. 971, 83 L. Ed. 2d 975 (1985); see also *United States* v. *DiFrancesco*, 604 F.2d 769, 775 (2d Cir. 1979) (''disclosure of . . . participation [in a witness protection program] must be handled delicately . . . so as to minimize the possibility that the jury will infer that the defendant was the source of danger to the witness'' (citation omitted; internal

State *v.* Bermudez

quotation marks omitted)), rev'd on other grounds, 449 U.S. 117, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980).

Accordingly, we agree with the Appellate Court that, as a general matter, in order to minimize the potential for undue prejudice, the state should not elicit testimony from a witness regarding the witness' participation in a witness protection program on direct examination but, rather, should wait until redirect examination to do so, and then only if the defense's cross-examination of the witness opened the door to such testimony. See *State* v. *Bermudez*, supra, 195 Conn. App. 804. As that court explained, however, courts are in general agreement that prosecutors may appropriately introduce evidence of their witnesses' participation in the witness protection program " 'to counter any inference of improper motivation or bias and, under some circumstance[s], may [present this evidence] on direct examination in anticipation of a defense attack [of] the witnesses' credibility.' " Id., 799, quoting *United States* v. *Melia*, supra, 691 F.2d 675; see also *State* v. *Harris*, 521 N.W.2d 348, 352 (Minn. 1994) ("In anticipation of the challenge to [a] witness' credibility, the prosecution may wish to bring out the witness' involvement in the [witness protection] program so as not to appear to be hiding anything from the jury. . . . To bolster the witness' credibility, the prosecution may also want to introduce evidence that the decision to testify has resulted in negative consequences to the witness." (Citation omitted.)). These courts have recognized that testimony about a witness' participation in a witness protection program, although prejudicial, "is permissible so long as the prosecutor does not attempt to exploit it." *United States* v. *DiFrancesco*, supra, 604 F.2d 775; see id. ("[s]ince a defendant often will seek to impeach a participating witness by showing that he has received significant benefits while in the program, the government may desire to bring out the witness'

State *v.* Bermudez

participation during direct examination in order to avoid an inference that the government was attempting to hide the witness' possible bias''); see also *United States* v. *Ciampaglia*, 628 F.2d 632, 640 (1st Cir.) (''[a]t least when not exploited by the prosecution, the possibility that . . . disclosure [that a witness is in the witness protection program] might cause undue prejudice to defendants is . . . generally minimal''), cert. denied, 449 U.S. 956, 101 S. Ct. 365, 66 L. Ed. 2d 221 (1980), and cert. denied sub nom. *Bancroft* v. *United States*, 449 U.S. 1038, 101 S. Ct. 618, 66 L. Ed. 2d 501 (1980). Some courts also require trial courts to provide limiting instructions regarding the proper use of this evidence. See *State* v. *Harris*, supra, 352 (''[i]f admitted, the trial court must give the jury explicit instructions as to the use of the evidence'' and ''strictly control the use of the evidence by the prosecution to prevent its exploitation''). We are persuaded that the present case represents a rare instance in which it was appropriate for the state to present evidence of a witness' participation in a witness protection program during its direct examination of the witness.

There can be no question that both the prosecutor and the trial court knew in advance of trial that Algarin's reason for waiting twelve years to come forward would be the central focus of the defense's attack on the state's case. The defendant's trial was the fourth trial arising out of the victim's murder and the second one to be presided over by the judge in this case. See *State* v. *Santiago*, 187 Conn. App. 350, 202 A.3d 405, cert. denied, 331 Conn. 902, 201 A.3d 403 (2019). As in the present case, in *Santiago*, Algarin's testimony was the linchpin of the state's case, and her reasons for coming forward when she did were as strongly contested in that case as they were in the present case.[16] See id., 365–66 (''[E]vi-

---

[16] It appears that Algarin's testimony was not as crucial in the trial of Bonilla, who gave a detailed confession to the police at the time of his arrest. See *State* v. *Bonilla*, 317 Conn. 758, 761–62, 120 A.3d 481 (2015).

State *v.* Bermudez

dence of the uncharged misconduct was probative to explain why Algarin feared [Santiago] and waited twelve years before telling the police about her knowledge of Morales' murder. The state argued that admitting evidence of severe domestic abuse was material to corroborating crucial prosecution testimony. In its ruling admitting such evidence, the court relied on *State* v. *Yusuf*, 70 Conn. App. 594, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002), noting 'that a delay in disclosing is a significant event that the state must have some type of explanation for. So it's an important—it's extremely important if the state has any explanation for a delay in reporting.' ''); *State* v. *Santiago*, supra, 358 ("[Santiago] stated in his [appellate] brief . . . that the 'main focus in [the] cross-examination [of Algarin] was to suggest that [she] made up the story about [Santiago's] and his brothers' involvement in the murder because she was concerned about Maldonado's safety in jail and wanted to get favorable treatment for him in his criminal case.' Defense counsel also questioned Algarin regarding the reward for which she applied and suggested that she may have fabricated her testimony in order to qualify for the reward.").

Because the trial court knew in advance that Algarin's purported fear of and need for protection from the defendant and his brothers would be a central focus of the trial and that the defense would argue that Algarin was lying when she claimed that fear had prevented her from coming forward sooner, we cannot conclude that it was an abuse of that court's wide discretion to allow Algarin to testify, on direct examination, that she was relocated by the state immediately after giving her statement to the police due to fear of reprisals from the defendant and his brothers. See, e.g., *United States*

The principle issue on appeal in *Bonilla* was whether there was sufficient evidence to establish the intent element of Bonilla's murder as an accessory conviction. Id., 765–66.

State *v.* Bermudez

v. *Deitz*, 577 F.3d 672, 689 (6th Cir. 2009) (prosecutor should not refer to witness protection program unless need for protection is obvious, relevant, or made an issue by defense counsel), cert. denied, 559 U.S. 984, 130 S. Ct. 1720, 176 L. Ed. 2d 201 (2010).

In *Melia*, the United States Court of Appeals for the Fourth Circuit explained that, when reviewing the admission of this evidence on appeal, courts "must consider whether such evidence was in its totality excessive and likely to excite the [jurors], encouraging them to make improper inferences linking the defendant to threats against the witness." *United States* v. *Melia*, supra, 691 F.2d 676. In *Deitz*, the United States Court of Appeals for the Sixth Circuit concluded that evidence that various witnesses participated in the witness protection program "was relevant to the . . . history of violence and reputed practice of retaliating against witnesses and informants [of the defendant's motorcycle gang]." *United States* v. *Deitz*, supra, 577 F.3d 689. Although the court warned that the evidence could "[r]aise negative inferences against the defendant if great care is not employed"; (internal quotation marks omitted) id.; it concluded that its admission in that case was not prejudicial because the government did not attempt to use it to enhance the credibility of the witnesses or to imply that the defendant himself was threatening the witnesses. See id.; see also *United States* v. *Vastola*, 899 F.2d 211, 236 (3d Cir.) ("the potential for prejudice is slight [when the witness protection program] testimony only vaguely suggests that the witness was placed in the program because of threats emanating from the defendant"), vacated on other grounds, 497 U.S. 1001, 110 S. Ct. 3233, 111 L. Ed. 2d 744 (1990).

As in *Deitz*, evidence of Algarin's relocation was highly relevant to her claimed fear of the defendant and his brothers and that this fear remained even after they were incarcerated, a central focus of defense counsel's

State *v.* Bermudez

efforts to impeach her at trial. As the Appellate Court
noted, the jury reasonably could have concluded, con-
trary to the defendant's assertion, "that Algarin's will-
ingness to subject herself to the upheaval and disruption
of moving herself and her four children multiple times
was credible evidence of her belief that, due to the . . .
gang affiliation[s] [of the defendant and his brothers],
she and her family were not safe." *State* v. *Bermudez*,
supra, 195 Conn. App. 797–98; see also *State* v. *Burney*,
288 Conn. 548, 566–67, 954 A.2d 793 (2008) (trial court
did not abuse its discretion in admitting evidence of
victim's emotional state to explain her delay in reporting
sexual assault when "the defendant had made such
testimony 'virtually essential' by effectively attacking
the victim's credibility on the basis of the time lapse
between the sexual assault and her first report of it").
The jury also reasonably could have concluded that
Algarin's relocation explained her willingness to testify
against the defendant and his brothers, despite her long-
standing fear of retaliation.

Importantly, the state did not exploit this evidence.
Algarin's testimony regarding her relocation was rela-
tively brief in the context of her two days of testimony,
the questions posed to her and her responses thereto
did not directly implicate the state in a way that might
suggest that the prosecutor was vouching for her credi-
bility, and the prosecutor made only brief reference to
it in closing argument.[17] Cf. *United States* v. *Melia*,

---

[17] Although the trial court did not provide the jury with a limiting instruc-
tion concerning this evidence, we note that the defendant did not request
one. Nonetheless, we agree with the Minnesota Supreme Court that, when
admitting evidence of this sort, the best course is for the trial court to
provide the jury with a limiting instruction as to its proper use in order to
reduce the potential prejudice to the defendant. See *State* v. *Harris*, supra,
521 N.W.2d 352. Such an instruction in the present case would have informed
the jury that Algarin's testimony regarding her relocation was to be used
solely in assessing her credibility as to her reasons for waiting twelve years
to come forward.

State *v.* Bermudez

supra, 691 F.2d 676 ("dramatic testimony of [five wit-
nesses concerning the witness protection program] was
excessive—an abuse by the government of its privilege
to utilize this potentially volatile evidence"); *State* v.
*Harris*, supra, 521 N.W.2d 352 ("prosecutor's ques-
tioning of witnesses about their participation in the
[witness] protection program did not just occur once
or with only one witness, but rather was an important
focus of her [direct examination]," and, thus, "created
an inference that [the defendant] was responsible for
the threats to [them], an inference unsupported by any
evidence"). We note, moreover, that the evidence was
not presented in such a way as to suggest that Algarin
was in the witness protection program because of direct
threats by the defendant. See, e.g., *United States* v.
*Deitz*, supra, 577 F.3d 689 ("courts have . . . deter-
mined that . . . references [to the witness protection
program] are admissible as long as they do not directly
implicate the defendant as a source of threats to the
witness"); *United States* v. *Vastola*, supra, 899 F.2d 236
("the potential for prejudice is slight [when the witness
protection program] testimony only vaguely suggests
that the witness was placed in the program because of
threats emanating from the defendant"). Indeed, Algarin
testified that the defendant never abused her and that,
in fact, he had even intervened on her behalf when
Santiago assaulted her. The purpose of the testimony,
rather, was to rebut the defendant's argument that Alg-
arin was not genuinely afraid of him and his brothers,
and the record reflects that the prosecutor utilized it
solely for that purpose when he argued in closing argu-
ment that Algarin was "still in relocation, still in fear
of the [defendant and his brothers]." In light of the
foregoing, we conclude that, under the circumstances
of this case, the trial court did not abuse its discretion in
admitting evidence that Algarin was relocated following
her statement to the police inculpating the defendant
and his brothers in the victim's murder.

State *v.* Bermudez

## II

We next address the defendant's claim that certain evidentiary rulings by the trial court were constitutional in nature and that the state cannot prove that these constitutional errors were harmless. Specifically, the defendant contends that the court violated (1) his constitutional right under the sixth and fourteenth amendments to the United States constitution to present a defense and to confront witnesses against him by refusing to admit into evidence three sexually explicit letters Algarin had written to him while he was in prison, and (2) his right to confrontation by preventing him from questioning her about the termination of her employment at Waterbury Hospital and her birth control practices. The defendant sought to admit the letters to prove that Algarin had a motive for falsely inculpating him and Santiago in the victim's murder. He sought to question Algarin about conduct relating to Santiago, namely, the reason for the termination of her employment and her birth control practices, to discredit her testimony that she was afraid of Santiago. We disagree with the defendant.

A

We begin with the trial court's exclusion of Algarin's letters, in which she professed her love for, and sexual attraction to, the defendant in passionate and graphic terms, including descriptions of certain sex acts. The Appellate Court concluded that, although exclusion of the letters did not state a claim that was constitutional in nature in light of the adequate opportunity provided to the defense to cross-examine Algarin on them, it was evidentiary error to exclude them but that this error was harmless. See *State* v. *Bermudez*, supra, 195 Conn. App. 809–10. The defendant argues that being permitted to cross-examine Algarin about the letters was insufficient and that precluding the jury from seeing the letters

themselves was not harmless because the letters "went
to the heart of [his] defense and explained Algarin's
motive to fabricate her allegations." Although we dis-
agree with the defendant, we reach that conclusion by
a different route than that taken by the Appellate Court.

At the outset, it is important to clarify the purpose
for which the defendant intended to use the letters and
the trial court's ground for precluding their admission.
Prior to trial, the state filed a motion in limine to pre-
clude admission of three letters Algarin had written to
the defendant while he was in prison, citing several
grounds, including that they were more prejudicial than
probative. In its memorandum in support of its motion
in limine, the state argued that the letters were unduly
prejudicial for the following reason: "[B]ecause some
portions of the letters are sexually graphic, it may
unduly arouse the [jurors'] emotions of prejudice, hos-
tility or sympathy or may have an adverse effect [on]
the witness beyond tending to prove the fact or issue
that may justify its admission. . . . Allowing admission
. . . would subject [Algarin] to ridicule and scorn, and
would not, in any way, be relevant to the issues at trial,
or the credibility of the witness."

The trial court did not rule on the motion until the
state concluded its direct examination of Algarin. On
direct examination, Algarin testified that, although San-
tiago had threatened to harm her or her loved ones on
more than one occasion, she had never had a problem
with the defendant and he had in fact intervened to
protect her from Santiago's physical abuse on more
than one occasion. She admitted, however, that she
feared "retaliation" by the defendant and his brothers,
and the gangs with which they were affiliated. Before
the defense commenced its cross-examination, the
court heard argument on the state's motion in limine to
preclude admission of Algarin's letters to the defendant.
Defense counsel contended that the letters were highly

State *v.* Bermudez

relevant because, although Algarin claimed that she was afraid of the defendant and his brothers, the letters constituted evidence of her motive to falsely implicate the defendant in the victim's murder. Specifically, defense counsel asserted that the defendant had given the letters to Santiago, through their mother, that the letters had prompted Santiago to end his sixteen year relationship with Algarin, and that Algarin had concocted her story implicating the defendant as revenge for the breakup of that relationship.[18]

The trial court ruled that there was no reason to introduce the letters themselves but that defense counsel could question Algarin about the letters and specifically refer to them as "graphic letters about having sex with the defendant . . . ." The trial court furthered stated that it would allow defense counsel to "go line by line talking about [the] various sex acts that [Algarin wanted] to do with the defendant" but that it "[did not] think [that there was] a need to read the exact language in the letter . . . ."

The next day, during his cross-examination of Algarin, defense counsel sought to admit one of the letters in redacted form. At that time, outside the jury's presence, the following colloquy occurred:

"The Court: It's not being admitted at all. I've already ruled. . . . I believe [that] the prejudicial impact . . . outweighs its probative value [and that] the probative

---

[18] Defense counsel replied to the court's relevance inquiry as follows: "Because she is contending that she was in fear of not only . . . Santiago and [Bonilla], but also [the defendant]; she was in fear. The information is—*and this is what I want to inquire into*—is that, once those letters were written to [the defendant], [he] gave them to his mother, and his mother was able to get those—send those letters to [Santiago]. After . . . Santiago read those letters to [the defendant] . . . he called [Algarin] up and said, 'It's over, baby; it's over.' So, after she [became] aware that their relationship was over—this is after, what, sixteen years . . . she finds out that he's breaking up with her, she's history. *She then has a motive to concoct this scenario.*" (Emphasis added.)

State *v.* Bermudez

value can be explored . . . by cross-examining the witness . . . but I will not allow . . . the defense to use any of the [salacious] language in the letter. . . .

"[Defense Counsel]: *I agree with the court regarding the language.* The [salacious] language is taken out of this [letter] . . . . It's just one letter . . . [that] I again say . . . is vital to the defense.

"The Court: What is? What's vital? Let me see what it is that you want in . . . that I haven't allowed in. It says 'Pooch Baby, I love you.'

"[Defense Counsel]: Yeah.

"The Court: Okay, you can ask her about that. . . . You don't need to have the letter in. . . . What else in this letter is vital to the defense that I'm missing? 'I miss you, baby.' [You can ask her] [d]idn't you say 'I miss you, baby?'

"[Defense Counsel]: Okay. 'Baby, your picture is the first thing I look at.'

"The Court: Go ahead, you can ask that.

"[Defense Counsel]: 'You look blazing.'

"The Court: You what?

"[Defense Counsel]: 'You look blazing.'

"The Court: Whatever. I said you can ask [that]. Those aren't what I would view as salacious comments. You can ask any question that goes to her affection toward [the defendant]. . . . I mean, it cuts both ways [counsel]. One of the things I instruct the jury is that [it] consider any motive to lie, any animosity toward [the defendant]. In some ways you're creating a case for the state that . . . she has no animosity toward [the defendant] and that she wouldn't have made this up. But that's your choice."

State *v.* Bermudez

Thereafter, defense counsel resumed his questioning
of Algarin, during which he asked her about the content
of the letters within the parameters set by the trial
court. Specifically, he asked her whether she had sent
the defendant three "sexually explicit" letters in which
she had expressed her love for him, which Algarin
admitted having done.[19] He did not go through the letters

[19] The following constitutes the entirety of defense counsel's cross-examination of Algarin about the letters:

"[Defense Counsel]: Do you remember sending [the defendant] a series, three letters that were sexually explicit?

"[Algarin]: Yes.

"[Defense Counsel]: This is your husband's brother, correct?

"[Algarin]: Yes.

* * *

"[Defense Counsel]: Do you remember saying I love you?

"[Algarin]: It says it there.

"[Defense Counsel]: Is that your handwriting?

"[Algarin]: Yeah.

"[Defense Counsel]: Do you remember when you sent that to him?

"[Algarin]: No.

* * *

"[Defense Counsel]: You did say that you did send sexually explicit letters to [the defendant], correct?

"[Algarin]: Yes, sir.

"[Defense Counsel]: And you sent at least three correct?

"[Algarin]: I believe so.

"[Defense Counsel]: Now, after you sent those letters to [the defendant], isn't it true that [Santiago], after being with you for sixteen years, broke up with you in 2009?

"[Algarin]: That is not true.

"[Defense Counsel]: When did he break up with you?

"[Algarin]: I broke up with him because he faked a stroke in federal prison and had someone call me at work to tell me that he was dying, and that's when I called the federal penitentiary and told them I do not want any more contact with him, no phone call, no e-mail, no letter, no nothing."

On recross-examination, the following exchange ensued:

"[Defense Counsel]: Now, you said something about the letter that you wrote to [the defendant], that you went to a website?

"[Algarin]: AOL.

"[Defense Counsel]: To look up what?

"[Algarin]: I went to an adult website, and I wrote down what I saw.

"[Defense Counsel]: What you saw on the adult website?

"[Algarin]: Yes, sir.

* * *

"[Defense Counsel]: And you referred to [the defendant] as B-Real in that letter, correct? . . .

341 Conn. 233 FEBRUARY, 2022 269

State *v.* Bermudez

line by line with her, as the court had permitted him
to do, however. Nor did he recite aloud any of the
nonsalacious portions of the letters, as the court also
had permitted him to do. In accordance with his stated
purpose for introducing the letters, he asked her
whether it was true that Santiago broke up with her
"after [she] sent [the] letters . . . in 2009," to which
Algarin responded, "[t]hat is not true." She then claimed
that it was she who had ended the relationship with
Santiago because of an unrelated incident in 2008. On
redirect examination, Algarin explained that she had
written the letters because, after the police reopened
their investigation into the victim's murder, the defen-
dant asked her to write them as insurance against her
reporting him to the police because they would discredit
her. She stated that the defendant had not forced her
to write the letters; he simply asked, and she complied.
Although Algarin denied that the letters were the cause
of the end of her relationship with Santiago, the defen-
dant never proffered any other evidence to prove that

"[Algarin]: [The defendant] asked me to write B-Real.

"[Defense Counsel]: Did he ask you in a letter? Did he send you a letter
saying correspond with me with sexually explicit language and use the—

"[Algarin]: He asked me—he needed something for reassurance that I
was not gonna snitch.

"[Defense Counsel]: That's a letter that he wrote to you?

"[Algarin]: No. That's a conversation we had.

"[Defense Counsel]: When did you have that conversation?

"[Algarin]: After [Bonilla] moved in and that article came out in the
newspaper.

* * *

"[Defense Counsel]: And had you used AOL to get the verbiage out of—
for [another] letter as well?

"[Algarin]: Some of it, yeah.

"[Defense Counsel]: Some of it?

"[Algarin]: Yeah, 'cause it's not all sexual and not—not all saying, you
know. Some of it's saying, hey, how are you, and some of it's very sexual.

"[Defense Counsel]: Very sexual, correct?

"[Algarin]: Yeah.

"[Defense Counsel]: Okay. And you say that that was requested at the
behest of [the defendant]?

"[Algarin]: Yes, 'cause this showed up in [Santiago's] trial as insurance."

State *v.* Bermudez

he had provided the letters to his mother, that Santiago had seen the letters or learned of their existence, or that Santiago had initiated the breakup of the relationship with Algarin.

The defendant's challenge to the trial court's ruling precluding admission of the letters is governed by the following settled principles. "Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense." *State* v. *Cerreta*, 260 Conn. 251, 261, 796 A.2d 1176 (2002). "While the [c]onstitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, [well established] rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes* v. *South Carolina*, 547 U.S. 319, 326, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006); see, e.g., *State* v. *Sandoval*, 263 Conn. 524, 545, 821 A.2d 247 (2003) ("evidence of [a witness'] abortion, in certain circumstances, may give rise to a real risk of unfair prejudice because such evidence necessarily implicates a woman's sexual history and her highly personal decision to terminate a pregnancy"); *State* v. *Swain*, 101 Conn. App. 253, 269, 921 A.2d 712 ("[T]he fact that [the complaining witness] was incarcerated might be expected to cause a negative reaction in the eyes of the [jurors]. It is not difficult to presume that such negative feeling could unduly prejudice a witness." (Emphasis omitted; footnote omitted.)), cert. denied, 283 Conn. 909, 928 A.2d 539 (2007). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. . . . It does not follow, of course, that the [c]onfrontation [c]lause of the [s]ixth [a]mendment prevents a trial judge from imposing any

State *v.* Bermudez

limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he [c]onfrontation [c]lause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Delaware* v. *Van Arsdall*, 475 U.S. 673, 678–79, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); see also *State* v. *Gaynor*, 182 Conn. 501, 508, 438 A.2d 749 (1980) (right of accused to cross-examine adverse witness "may be limited [when] the sixth amendment interest is outweighed by the danger of harassing witnesses or unduly prejudicing the jury" (internal quotation marks omitted)).

Thus, "[t]he defendant's right to cross-examination . . . is not absolute [but rather] is subject to reasonable limitation by the court. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge. This discretion comes into play . . . after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Dobson*, 221 Conn. 128, 137, 602 A.2d 977 (1992).

Unlike the Appellate Court, we begin with the question of whether the trial court correctly concluded that the letters were more prejudicial than probative. See

State *v.* Bermudez

*State* v. *Sandoval*, supra, 263 Conn. 544–46 (considering whether trial court abused its discretion in ruling that prejudicial effect of proffered evidence outweighed its probative value before assessing whether ruling was of constitutional magnitude or merely evidentiary in nature); see also *State* v. *Christian*, 267 Conn. 710, 750, 841 A.2d 1158 (2004) (considering whether trial court improperly excluded witness' testimony before assessing whether that ruling was of constitutional magnitude or merely evidentiary in nature). We cannot help but observe that the trial court's ruling appears to be directed more at protecting the assumed delicate sensibilities of the jurors from exposure to offensive words than at protecting Algarin from undue embarrassment. We question whether Algarin would have been appreciably less humiliated by having the jurors read the letters than having them hear about the sex acts described therein, line by line, in more clinical terms in cross-examination, as permitted by the trial court's ruling. If the specific terminology was probative of facts relevant to the defendant's revenge theory, the trial court would have abused its discretion in precluding the defendant from introducing the letters into evidence simply because they contained vulgar language. Cf. *United States* v. *Schweihs*, 971 F.2d 1302, 1314 (7th Cir. 1992) (concluding that District Court did not abuse its discretion in denying in part defense motion in limine to redact from videotape evidence offensive language, either racially or ethnically derogatory or coarse and vulgar, because offensive language had probative value to issues in case); see also *United States* v. *Soltero-Olivas*, 285 Fed. Appx. 476, 478 (9th Cir. 2008) (concluding that District Court did not abuse its discretion in admitting transcript of defendant's telephone conversation containing vulgar language when risk of unfair prejudice did not substantially outweigh transcript's probative value).

Several factors, however, persuade us that the sexually graphic language and the letters more generally

State *v.* Bermudez

were of little to no probative value. The lack of probative value of the sexually graphic aspects of the letters is evidenced by defense counsel's express concession that he "agree[d]" with the court that the jury did not need to see the salacious language when he requested the admission of a redacted form of one letter. Consistent with that concession, he declined to ask Algarin a single question about the sexual aspect of the letters, other than whether she had sent the defendant "sexually explicit" letters. See footnote 19 of this opinion. More important, the defendant's failure to introduce any evidence to support the factual predicates to his theory of relevance negated the probative value of the letters. In order for the letters to be relevant to the defendant's revenge theory, Santiago would have had to see them or, at the very least, learned of their existence and contents. No evidence was proffered from which the jury could have inferred either fact, let alone that Santiago was the one who had ended the relationship. "When the admissibility of evidence depends upon connecting facts, the court may admit the evidence upon proof of the connecting facts *or subject to later proof of the connecting facts.*" (Emphasis added.) Conn. Code Evid. § 1-3 (b). "If the proponent fails to introduce evidence sufficient to prove the connecting facts, the court may instruct the jury to disregard the evidence or order the earlier testimony stricken. *State* v. *Ferraro*, 160 Conn. 42, 45, 273 A.2d 694 (1970); *State* v. *Johnson*, 160 Conn. 28, 32–33, 273 A.2d 702 (1970)." Conn. Code Evid. § 1-3 (b), commentary. The trial court did not issue such an order, but its discretion to do so evidences the lack of probative value of the letters in the absence of proof of the connecting facts.[20]

[20] The prosecutor never moved to strike the testimony related to the letters due to the absence of evidence to support the breakup theory, but the prosecutor did object to a defense question on this basis and did point out this omission in its rebuttal argument to the jury.

State *v.* Bermudez

Although the trial court treated the letters as independently probative of whether Algarin was fearful of the defendant; see *State* v. *Bermudez*, supra, 195 Conn. App. 810–11; the defendant did not seek admission of the letters on that basis. Indeed, the trial court overruled the state's hearsay objection on the ground that the content of the letters was not being admitted for its truth. It is true that, if the jury had accepted the defendant's revenge theory, that theory would have discredited Algarin's claim that she had delayed disclosing what she knew about the defendant's and his brothers' involvement in the victim's murder because she feared retribution. The defendant evidenced no intention, however, to use the letters themselves as *direct* proof of Algarin's state of mind. The defendant never asked Algarin any questions about the letters with regard to her state of mind, and the only reference to the letters in defense counsel's closing argument was in connection with the revenge theory. Moreover, there was no reason for the defendant to offer the letters to prove that Algarin was not fearful of the defendant. Algarin essentially admitted that she had a good relationship with the defendant; she had no reason to fear him, as long as she did not inculpate him in the crime. The prosecutor in fact used Algarin's testimony about her good relationship with the defendant to argue in closing argument that Algarin had no motive to lie about the defendant.[21]

Insofar as the defendant contends that the trial court's exclusion of the letters deprived him of the opportunity to effectively impeach Algarin's credibility, he has failed to demonstrate how the specific contents of the letters

[21] The prosecutor argued: "When you judge [Algarin's] credibility, consider this: No motive to lie about the defendant. He was nice to her. . . . She never had a problem with him. She testified to that. That night she was getting beat, the night of the incident . . . the defendant stops her from getting beat. . . . He had stopped . . . Santiago from beating her on other occasions. Why would she lie about this defendant? . . . Why implicate the defendant unless it was true?"

bore on that issue.[22] Therefore, we conclude that the
trial court did not abuse its discretion in concluding
that the prejudicial effect of the letters outweighed their
probative value. In the absence of evidentiary error or a
colorable claim that application of the rules of evidence
resulted in a manifest injustice, the defendant cannot
establish a violation of his constitutional rights to con-
front witnesses or to present a defense.

B

Last, we turn to the defendant's claim that the trial
court committed harmful, constitutional error when it
prevented him from questioning Algarin about the cir-
cumstances surrounding the termination of her employ-
ment from Waterbury Hospital and her birth control
practices during her marriage to Santiago. The defen-
dant contends that "[b]oth of these matters were directly
relevant to the central issue at trial—[Algarin's] fear of
Santiago as the reason why she delayed going to the
police for [twelve] years." Although we might have
decided these evidentiary questions differently from the
trial court, we agree with the Appellate Court that the
exclusion of these matters was not constitutional in
nature and that the trial court did not abuse its discre-
tion in precluding the two lines of inquiry.

The following facts and procedural history are rele-
vant to our resolution of the defendant's claim. In an
effort to further impeach Algarin, defense counsel
asked her whether she felt sorry for Santiago in January,
2004, when he was admitted to the psychiatric unit at
her place of employment, Waterbury Hospital. The trial
court sustained the prosecutor's objection on relevancy

[22] We note that, after Algarin testified that she had written the salacious
letters at the behest of the defendant and that she had drawn on an online
adult website for some of the sexually explicit language in at least one of
the letters, defense counsel never renewed his objection to the exclusion
of the letters on the ground that they were relevant impeachment evidence
with regard to those facts.

State *v.* Bermudez

grounds. Outside the presence of the jury, defense counsel explained that Algarin's purported fear of Santiago was contradicted by her objection to the treatment Santiago received at the hospital in 2004, which was so "disruptive" that it ultimately resulted in her employment being terminated. Defense counsel argued: "She's claiming that . . . she's terrified of this guy, she doesn't want to be with him, but, in 2004, she gets so worked up, yelling at people, being rude to people at the . . . hospital, and she's dismissed for that reason . . . ." The court reaffirmed its ruling sustaining the prosecutor's objection, finding that the evidence was "totally irrelevant," that the defense had various other avenues of impeachment, and that, to the extent the evidence possessed any relevance, its "probative value [was] far outweighed by [its] prejudicial impact." The following day, the defense again sought to introduce evidence of Algarin's behavior at the hospital, this time through examination of Crozier. The court sustained the prosecutor's objection, concluding that the evidence was irrelevant, did not go to truth and veracity, was cumulative of other evidence contradicting Algarin's fear of Santiago, and was too remote in time, and that, even if it were relevant, its prejudicial effect outweighed its probative value.

During cross-examination, defense counsel also asked Algarin why she had conceived two more children with Santiago after the victim's murder, despite her purported fear of him, to which Algarin responded that Santiago had hid her birth control and had prevented her from seeing her gynecologist to get more. When defense counsel pressed Algarin whether there were other means by which she could have prevented becoming pregnant, the court sustained the prosecutor's objection to continued inquiry on the topic. The following day, the court again disallowed further inquiry into Algarin's birth control practices, finding that the subject matter was irrelevant.

State *v.* Bermudez

The Appellate Court's reasoning in concluding that the trial court did not abuse its discretion in precluding the two lines of inquiry equally demonstrates why these rulings were not constitutional in nature. See *State* v. *Dobson*, supra, 221 Conn. 137 ("[t]he constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness" (internal quotation marks omitted)). As the Appellate Court explained, quoting *State* v. *Annulli*, 309 Conn. 482, 493–95, 71 A.3d 530 (2013), "[a] court . . . [may] exclude . . . evidence [that] has only slight relevance due to . . . its tendency to inject a collateral issue into the trial. . . . An issue is collateral if it is not relevant to a material issue in the case *apart from its tendency to contradict the witness*. . . . This is so even when the evidence involves untruthfulness and could be used to impeach a witness' credibility. . . . Whether a matter is collateral also is a determination that lies within the trial court's sound discretion. . . . Undoubtedly, our case law permits a party to ask a witness about a collateral matter, with the limitation that the party must accept the witness' response without having the opportunity to impeach that witness with extrinsic evidence. . . . This does not mean, however, that the trial court is obligated to permit such questioning. In considering whether the court abused its discretion in this regard, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Emphasis in original; internal quotation marks omitted.) *State* v. *Bermudez*, supra, 195 Conn. App. 819.

Like the Appellate Court, we conclude that it was a proper exercise of the trial court's discretion to con-

State *v.* Bermudez

clude that the circumstances surrounding the termination of Algarin's employment from Waterbury Hospital were simply too remote and "would have injected a collateral issue into the trial." Id. We also agree with the Appellate Court that the trial court properly found that further inquiry into Algarin's birth control practices, after defense counsel questioned her about why she continued to have children with Santiago after the victim's murder, "would have inappropriately focused on a matter far too attenuated from the material issues in the case." Id., 820.

Even if we were to conclude that the trial court should have permitted some inquiry into these two areas, we nevertheless would conclude that the error was harmless in light of the ample opportunity defense counsel had at trial to impeach Algarin's purported fear of Santiago. To the extent that the excluded lines of inquiry were relevant to this issue, they were merely cumulative of other defense evidence calling into question the genuineness of her fear. We note, moreover, that the defense's theory that Algarin could not have been genuinely afraid of the defendant and his brothers in light of the loyalty she demonstrated to them over the years was not a particularly strong defense. It is common knowledge that many victims of spousal abuse stay with their abusers for years, often appearing to the outside world to be in happy, loving relationships. Many undoubtedly love their spouses and try to make them happy. Many, like Algarin, have children with their abusers, even after the abuse starts. To argue, therefore, that Algarin's support of Santiago during their marriage was proof that she was not genuinely afraid of him and could not have seriously believed that he would hurt her if she turned him into the police simply flies in the face of reality.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.